# EXHIBIT V

                                    Pages 1 - 31

                       UNITED STATES DISTRICT COURT

                     NORTHERN DISTRICT OF CALIFORNIA

                 BEFORE THE HONORABLE WILLIAM H. ALSUP, JUDGE

UNILOC USA, INC., et al.,          )
                                   )
              Plaintiff,           )
   VS.                             ) NO. C 18-00363 WHA
                                   ) Related Cases:  C 18-360,
                                   ) C 18-365, C 18-572
APPLE, INC.,                       )
                                   )  San Francisco, California
              Defendant.           )
_____)

                                     Tuesday, September 4, 2018

                       TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiffs:
                         PRINCE LOBEL TYE LLP
                         One International Place
                         Suite 3700
                         Boston, Massachusetts  02210
                  BY:  JAMES J. FOSTER, ESQ.

For Defendants:
                         GOLDMAN ISMAIL TOMASELLI
                           BRENNAN & BAUM, LLP
                         564 Randolph Street
                         Suite 400
                         Chicago, Illinois  60661
                  BY:  MICHAEL T. PIEJA, ESQ.

Also Present:
                         MARC BREVERMAN, ESQ.
                         JIMMY RUCK

Reported By:  BELLE BALL, CSR 8785, CRR, RDR
              Official Reporter, U.S. District Court

DRAFT COPY

## Page 10

```
 1    I'm just not privy to all of the machinations that go on by
 2    someone like Uniloc, but I believe machinations are possible to
 3    -- I just don't know all the motivations behind it.
 4         All I can tell you is that in that case, they were too
 5    cute by half, and maybe you were too cute by half.  And they
 6    get -- the Apple people get to look at it, and see if they
 7    think there's been standing.  So, I think that's relevant.
 8         It should have been disclosed to me sooner.  But I'm going
 9    to pass that for now.
10         The second reason it's relevant is that the financial
11    terms are highly relevant.  If -- if you are seeking $1 million
12    from Apple, but you sold it for a hundred thousand, that's a
13    pretty good argument that you're way over-priced.  And I would
14    think that's highly relevant.
15         However, that should be under a protective order so it
16    can't be used in some other case.  So that should be just for
17    purposes of this case only, and to give to your experts and the
18    lawyers, but nobody else.  So that should be the -- the dollar
19    amounts should be under protective order.  So that's what I'm
20    going to order.
21         Now, I think it ought to be produced within a week or two
22    weeks.  How much time do you need to get all of this?  And I
23    want you to do a good job, thorough job.
24         MR. FOSTER:  Oh, not much at all, Your Honor.  If we
25    can get to it them by the end of this week, we will.
```

## Page 11

```
 1         THE COURT:  Well, all right.
 2         MR. FOSTER:  You give me a deadline, how about a week
 3    from today?
 4         THE COURT:  All right, a week from today is your
 5    deadline, at noon.  So that's the best I can do.
 6         But on this one, I think Apple wins completely, subject
 7    only to the protective order part.  May not go anywhere,
 8    because there -- may be that the transferee gets to come into
 9    the case under Rule 25, and that the new transferee has all the
10    rights that they need, and end of story.
11         Okay.  Is that it?
12         MR. PIEJA:  There are a few other issues that may
13    have been resolved by Your Honor's ruling, but I just want to
14    raise them to see if Mr. Foster agrees.
15         In addition to the documents referenced in the asset
16    purchase agreement, the original owner, Uniloc Luxembourg,
17    granted a security interest in the patents-in-suit to a third
18    party called Fortress.  And that security interest gave, we
19    believe, Fortress the right to take possession of the assets
20    upon certain conditions.
21         THE COURT:  Sure.  That ought to be produced.  To me,
22    all of these -- "machinations" is the word I'm using.  The
23    Federal Circuit has some law on how much you can give away.
24    And I believe the parties in these kinds of cases push it
25    right up to the line to see how much they can give away and
```

## Page 12

```
 1    still have a standing.  And it may be you miscalculated.  So I
 2    think that ought to be produced, of course.
 3         All right, what's the next one?
 4         MR. PIEJA:  This is a relatively minor issue, Your
 5    Honor.  But in reviewing the asset purchase agreement, there's
 6    a provision in three that indicates the potential for a
 7    conflict of interest with respect to another lawfirm that
 8    appears to have been representing the new entity, Uniloc 2017,
 9    that may be -- that Uniloc has sought to bring into this case,
10    because they may also be doing work for Apple.
11         And we would -- I would request permission -- that page is
12    currently designated attorneys' eyes only.  So I can't -- at
13    this point, according to Mr. Foster, I can't tell my client the
14    name of the lawfirm that may have the conflict, so that they
15    can investigate whether in this case we have a problem with
16    that.
17         And so I would ask that that page be designated as
18    confidential, but that I be allowed to tell the name of the
19    lawfirm to my client so that we can evaluate whether by
20    representing, apparently, Uniloc in a transaction related to
21    this case, a conflict of interest has arisen that would require
22    some action.
23         THE COURT:  What do you say to that, Mr. Foster?
24         MR. FOSTER:  Your Honor, what I would point out -- I
25    should tell you, I don't have too much of a dog in this fight.
```

## Page 13

```
 1         What I pointed out to Mr. Pieja is that he wanted to
 2    use -- wanted his client to be able to use the information for
 3    purposes outside of the lawsuit so that --
 4         THE COURT:  To do what?
 5         MR. FOSTER:  He wanted his client to be able to use
 6    the information for purposes outside the lawsuit, so that
 7    technically was a violation of the protective order; we should
 8    bring it up with the Court to make sure the Court is okay with
 9    it.
10         THE COURT:  So I'm -- I'm not sure what the answer
11    is.  But let me see if I've gone the scenario right.
12         MR. FOSTER:  Sure.
13         THE COURT:  There's some other lawfirm out there in
14    the world that represents -- or represented Apple.  Maybe
15    still does, or maybe wants to in the future.  And in the asset
16    purchase agreement on the Uniloc side, there was a disclosure
17    about a potential conflict of interest that that lawfirm had,
18    by reason of the Apple representation.
19         Is that -- is that it?
20         Tell me what it is, then.
21         MR. FOSTER:  I'm learning, as you are, Your Honor.
22    But this is the way I understand it.
23         Lawfirm X drafted this 80-page document which transfers a
24    whole bundle of patents, and doesn't mention Apple or anything.
25    For all I know, Lawfirm X has no idea that the agreement would
```

## Page 14

1   have any effect on Apple. And Lawfirm X is not otherwise

2   involved in this suit. Hasn't entered an appearance, whatever.

3       Apparently Mr. Pieja is concerned that Lawfirm X is

4   drafting that document. Some of it might create -- I'm not

5   saying he's right or wrong. Some of it might create some kind

6   of a conflict with Apple, and he wants to be able to tell Apple

7   that Lawfirm X is drafting the transfer document.

8       We don't really have a dog in that fight. But because

9   that seems to be technically in violation of the order because

10  he's using information for purposes outside the lawsuit, I told

11  him we had to bring it up in front of the Judge to authorize

12  that disclosure.

13      THE COURT: And on the face of the document, is it

14  clear who -- who Lawfirm X is?

15      MR. FOSTER: They are listed as -- in the notice

16  paragraph, it said any notices should go -- copies should be

17  sent to Lawfirm X.

18      MR. PIEJA: If I may, Your Honor?

19      THE COURT: (Inaudible)

20      MR. PIEJA: First of all, I don't think -- it is not

21  correct for Mr. Foster to state that the document in question

22  doesn't identify Apple. There is a schedule in that document

23  that specifically lists out litigations that are to be pursued

24  by these entities that are being created. And there are over

25  half a dozen litigations on that list where the Uniloc entity

## Page 15

1   is proceeding against Apple.

2       So the drafters of that document knew that the entities

3   being formed, who we believe this lawfirm represented in the

4   formation, that those entities were being formed for the

5   express purpose of pursuing litigation against my client.

6       THE COURT: Well, was Lawfirm X -- to your knowledge,

7   one way or the other, was Lawfirm X then representing Apple?

8       MR. BREVERMAN: (Inaudible)

9   (Reporter interruption)

10      MR. PIEJA: Oh, sorry. I inquired of my client, but

11  it was foolish because I haven't been able to tell my client

12  who the firm is.

13      Based on public records, I believe that the answer to that

14  question is yes, that they are currently representing Apple.

15  But I could not swear, under oath, that that is correct.

16      THE COURT: Okay. Anything more?

17      MR. FOSTER: Nothing, Your Honor.

18      MR. PIEJA: Not on this point, Your Honor.

19      THE COURT: Okay, here's the answer. I think you

20  should tell Lawfirm X. And that means that your clients

21  should know who that is, if for no other reason than Apple and

22  X can have a conversation, and maybe not -- not exacerbate a

23  potentially embarrassing situation.

24      I want to be very clear. I'm not saying they have done

25  anything wrong. X. I'm not saying that X has done anything

## Page 16

1   wrong. But, but if we just continued on with them blindly

2   representing Uniloc in a situation where the lawyers think

3   there's at least a small potential for a conflict, then I think

4   it ought to be out in the open, with X being aware that you all

5   are aware of it, and that the client, Apple, is aware of it.

6       And that -- but I'm going -- I'm going -- I think I should

7   make an important statement to Apple. I think once you learn

8   who it is, you should have that conversation. I would be very

9   disappointed if Apple were to hold onto that information and

10  sandbag X, and then not bring it up with X, so that X is

11  sandbagged. I would not want sandbagging.

12      Do you understand what I'm saying? In other words --

13      MR. PIEJA: Yes, Your Honor.

14      THE COURT: In other words, I'm going to let you

15  reveal who X is to your client. But your client sure better

16  take up the issue with X, and soon, so that X can be aware

17  that Apple is aware, and that Apple has a problem with it, if

18  they do have a problem.

19      I don't -- I want to head off the situation which I can

20  easily imagine, machinations on Apple's part, where Apple sits

21  back in the weeds and lets that other firm continue getting

22  itself in potential trouble, and then says, "Ha, ha, I got

23  you."

24      We're not going to have that. And I would be disappointed

25  in Apple.

## Page 17

1   So do you understand the condition over there?

2       MR. BREVERMAN: I understand, Your Honor.

3       THE COURT: Thank you. All right.

4       All right, what's the next problem I can solve?

5       MR. PIEJA: The very last thing, and it's

6   peripherally related to the standing issues, is we have

7   requested separately a deposition on the documents we just

8   received yesterday. And --

9       THE COURT: Sure. You ought to --

10      MR. PIEJA: -- Mr. Foster is opposed.

11      THE COURT: Some depositions. I can't say how many,

12  but I'd say at least two depositions of people that are

13  implicated by these documents.

14      MR. PIEJA: Thank you, Your Honor. And those are all

15  the issues that Apple had, Your Honor.

16      MR. FOSTER: I have a few, Your Honor. Some of them

17  are just a matter of giving the Court notice.

18      We had filed a motion to add Uniloc 2017 as a plaintiff.

19      THE COURT: Sure.

20      MR. FOSTER: Mr. Pieja has asked for additional time

21  to respond to that motion. He asked for an additional ten

22  days. We don't have a problem with that. But we don't want

23  to be submitting stipulations to the Court without the Court

24  knowing about it.

25      THE COURT: Okay. You can -- I think what you should

1   do is hurry up and take these depositions so you can use that
2   information in the motion and your opposition. But you ought
3   to get this all done pronto. Pronto. Like next week, you
4   take these depositions.
5       MR. PIEJA: Yes, Your Honor.
6       THE COURT: If he says he can try to get you the
7   documents this week, maybe it will be next -- but pronto.
8   "Pronto" is the name of the game.
9       MR. PIEJA: We will take them extremely rapidly, Your
10  Honor. My only request on the extension is if they're going
11  to produce documents a week from today, we would ask for just
12  one week from the day we get the documents.
13      THE COURT: Fine.
14      MR. PIEJA: Okay.
15      THE COURT: To take the depositions. And Uniloc will
16  definitely cooperate in arranging the depositions.
17      MR. FOSTER: So there's no uncertainty, it will be
18  one week from our due date? Because we may produce the
19  documents earlier. But we don't want it floating around, what
20  your deadline is.
21      THE COURT: One week from when you complete, in full,
22  everything you're supposed to complete.
23      MR. FOSTER: Okay.
24      THE COURT: Everything. Not just 99 percent.
25      MR. FOSTER: All right.

1       THE COURT: All right. And then, you all let me know
2   how far off you have to push the hearing date in order to
3   accommodate the depositions. You'll have to do the math in
4   your head.
5       But -- you don't have to push it off, but if you do need
6   to, then please let me know, and we'll move it on the calendar.
7       MR. PIEJA: Yes. We'll work that out amongst
8   ourselves.
9       MR. FOSTER: The next issue, again by way of
10  scheduling, Apple filed a motion to strike some renewed
11  infringement contentions. Our response is due Thursday of
12  this week, which by some coincidence, is also the date that
13  papers are due on the summary-judgment motions.
14      So I asked Mr. Pieja for a week to respond to their
15  motion, and he has no problem with it. But again, we want --
16      THE COURT: That's fine.
17      MR. FOSTER: That's okay?
18      THE COURT: That's okay.
19      MR. FOSTER: I wanted to tell the Court about that.
20      THE COURT: Does that mean the hearing on that motion
21  has to be -- is there a hearing date?
22      MR. PIEJA: There is, Your Honor. It will be the
23  27th. And we intend to file our reply in a very prompt
24  manner, once they file their opposition.
25      THE COURT: All right. Well, then, maybe we'll keep

1   that date, then.
2       Okay, what else?
3       MR. FOSTER: The next issue -- it's a little
4   confusing. There was a case of -- a -363 case, brought on a
5   particular patent. That same patent was involved in a case in
6   the District of Washington against, I believe, HTC.
7       The judge up there granted a Rule 101 motion dismissing
8   the case. Uniloc filed a notice of appeal. I think our appeal
9   brief is due later this month.
10      But because it didn't seem to move forward -- didn't make
11  sense to move forward with the case here until the Federal
12  Circuit works out that appeal.
13      The confusion arises because Apple hasn't made up their
14  mind what they want do about that. There are three choices.
15  One is to dismiss the pending action without prejudice, and
16  wait for the Federal Circuit. A second option is simply to
17  stay the pending action, and wait for the Federal Circuit.
18      The third option is to dismiss the pending action with
19  prejudice, based on the Washington decision. And then a notice
20  of appeal gets filed, and the appeal gets merged with the
21  appeal before the Federal Circuit.
22      Our preference is the first. I've given Mr. Pieja the
23  choice. He says his client hasn't made up his mind. And I'm
24  just calling it to the Court's attention.
25      THE COURT: Well, have you all made your motions

1   for -- on the showdown procedure?
2       MR. PIEJA: We have, Your Honor. Replies are due
3   this Thursday.
4       THE COURT: Is the patent that's in -- I'm just
5   hearing about, is that one of your motions?
6       MR. PIEJA: It is not. Although if we went to
7   another round of that procedure, we would likely move for
8   summary judgment of invalidity, based on collateral estoppel.
9   For that particular patent.
10      Given that generally, a decision like the one issued in
11  the Western District of Washington would be given preclusive
12  effect while on appeal, we believe that Uniloc would be
13  collaterally estopped from asserting that that patent is valid.
14      THE COURT: Well, here's the thing, Mr. Foster. You
15  know, a District Judge could be wrong. I've been wrong
16  several times. And the Federal Circuit could reverse that
17  judge.
18      So I think the first choice is for you to decide if you
19  want to withdraw assertion of that patent. If you do, then
20  just withdraw it. And it won't be part of the case. But it
21  won't be in limbo, and the statute of limitations will then
22  begin to run on that one.
23      So --
24      MR. FOSTER: We have offered, Your Honor, to non-suit
25  ourselves, without prejudice. That's one of the three