```
                                            Pages 1 - 31

               UNITED STATES DISTRICT COURT

             NORTHERN DISTRICT OF CALIFORNIA

     BEFORE THE HONORABLE WILLIAM H. ALSUP, JUDGE

UNILOC USA, INC., et al.,       )
                                )
            Plaintiff,          )
  VS.                           ) NO. C 18-00363 WHA
                                ) Related Cases:  C 18-360,
                                ) C 18-365, C 18-572
APPLE, INC.,                    )
                                )  San Francisco, California
            Defendant.          )
_____)

                                 Tuesday, September 4, 2018

              TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiffs:
                  PRINCE LOBEL TYE LLP
                  One International Place
                  Suite 3700
                  Boston, Massachusetts  02210
            BY:   JAMES J. FOSTER, ESQ.

For Defendants:
                  GOLDMAN ISMAIL TOMASELLI
                    BRENNAN & BAUM, LLP
                  564 Randolph Street
                  Suite 400
                  Chicago, Illinois  60661
            BY:   MICHAEL T. PIEJA, ESQ.

Also Present:
                  MARC BREVERMAN, ESQ.
                  JIMMY RUCK

Reported By:  BELLE BALL, CSR 8785, CRR, RDR
              Official Reporter, U.S. District Court
```

DRAFT COPY

Page 2

1  Tuesday - September 4, 2018                10:07 a.m.
2                    P R O C E E D I N G S
3         THE CLERK:  Calling Civil Action 18-363, and related
4  Civil Cases 18-360, 18-365, 18-572.  Uniloc United States of
5  America, Inc., et al. versus Apple, Inc.
6         Counsel, please step forward and state your appearances
7  for the record.
8         MR. FOSTER:  For plaintiff, James Foster.
9         MR. PIEJA:  Good morning, Your Honor.  Michael Pieja
10  for the defendant Apple.  With me today is Mr. Marc Breverman,
11  Apple's in-house counsel, and Mr. Jimmy Ruck, who is a summer
12  associate with our lawfirm.
13         THE COURT:  Okay, thank you.  So how can I help the
14  lawyers today?
15         MR. PIEJA:  Your Honor, while we had been able to
16  make some progress on the issues presented in the discovery
17  letter brief, I think there are still a number of issues that
18  remain outstanding from the Court -- or before the Court, if
19  you are inclined to take them up for resolution at this time.
20         THE COURT:  Go ahead.  What is the first item?
21         MR. PIEJA:  Okay.  So as we laid out in the discovery
22  brief, the issue here that we're trying to get the bottom of
23  is:  Which entities currently own the patents that are being
24  asserted against my client.
25         And what we have learned from the limited discovery that

Page 3

1  we have gotten to date, almost all of which was produced
2  yesterday, is that in March of this year, Uniloc Luxembourg,
3  who is one of the plaintiffs here and who was at the time --
4         THE COURT:  March or May?
5         MR. PIEJA:  So there's two documents.  In March of
6  this year, Uniloc Luxembourg entered into an asset purchase
7  agreement to sell all the patents-in-suit to a newly-formed
8  entity called Uniloc 2017.  That deal -- and then after that
9  time, obviously, we had a case-management conference in this
10  case; we had the CMC statement.  None of that came up at that
11  point.
12         In early May, we have learned Uniloc 2017 actually closed
13  that deal.  And since that time, it appears Uniloc Luxembourg
14  hasn't had any rights in the patents-in-suit.
15         At a similar time, March, another entity was created that
16  is not a party to this case.  Uniloc Licensing.  And that
17  entity was also granted license rights, exclusive license
18  rights, in the patents-in-suit.  And while we have gotten
19  portions of the asset purchase agreement, we do not have the
20  entire agreement.  And what we do have has been redacted.
21         So the first issue that we would ask Your Honor is we
22  believe that Uniloc should be ordered to produce the entire
23  unredacted asset purchase agreement, including the attachments.
24         Several of the documents with these attachments that they
25  haven't produced relate to issues like what encumbrances are on

Page 4

1  the patents, and what other entities have a reversionary
2  interest in the patents, so could wind up with or may have
3  wound up with a title or ownership interest in some kind of
4  them.
5         I think those issues are all directly relevant to the
6  standing issues that our discovery brief raises.  I think it's
7  important that they be got to the bottom of now.
8         And at this point, my -- Uniloc is taking the position
9  that they either don't know about whether they will produce the
10  documents, or are unwilling to commit to so doing.
11         THE COURT:  All right.  Let's hear from Uniloc.
12         MR. FOSTER:  So Your Honor, just a few corrections.
13         There wasn't an asset purchase agreement in March.  We
14  understand these corporate things work out, then there's some
15  diligence period.  And then the transaction closed in early
16  May.
17         Those documents have (Inaudible) talk about in a minute
18  were produced --
19         THE COURT:  You've got to speak more clearly -- or
20  adjust the mic.  It's hard to hear you.
21         MR. FOSTER:  Okay.
22         THE COURT:  So maybe you can adjust it a little
23  higher.  Thank you.
24         MR. FOSTER:  Okay.  All right.  So that was the
25  schedule.  There was one mistake.

Page 5

1         And then one of my colleagues said the way the transaction
2  was structured, 70 or 80 pages, some document some major
3  lawfirm drafted, so with a lot of details in it.  But the way
4  it was structured was that the entire patent portfolio owned by
5  Uniloc Luxembourg was transferred to this Uniloc 2017 entity.
6         But the interesting wrinkle was that the entity which had
7  the exclusive license, Uniloc USA, still has an exclusive
8  license with respect to all suits which had been filed prior to
9  May, including these suits.  A new entity, Uniloc USA
10  Licensing, was set up to handle newly-filed litigation.
11  Regardless, we provided the documentation with respect to both
12  companies to Apple on that.
13         The issue which has come up and we discussed in advance of
14  the hearing here, there were actually two or three issues.
15  Mr. Pieja pointed out that the documents we produced to him did
16  not include certain schedules, including schedules dealing with
17  encumbrances.
18         I told him that the reason for that was my firm didn't get
19  them and didn't forward them, but we would look at them, and
20  assuming that there's nothing in there that we would object to,
21  said we'd produce them.
22         The only caveat I got -- I gave him on that was that our
23  client objects -- since the issue is standing, our client
24  objects to producing what I call the financial details.  How
25  much did you pay, this kind of thing.  And the client doesn't

Page 6

1  see how that's -- the amounts are relevant to standing, and
2  wanted us to object to that.
3       We would produce all of the documentation, and redacting
4  only the financial amounts, which aren't relevant to standing.
5       THE COURT: What do you say in reply?
6       MR. PIEJA: Yes, Your Honor. If what Mr. Foster is
7  representing to the Court is that they will produce all of the
8  documents referenced in the asset purchase agreement, which
9  include -- there are specific sections that lay these out --
10 additional transaction documents, ancillary agreements, and
11 disclosure schedules -- I didn't understand that to be their
12 position before, but obviously, if they are willing to produce
13 them, we appreciate that.
14      With respect to the financial terms, while those -- we
15 believe those should be produced, as well, for two reasons.
16 First, ultimately, the purchase price that this entity pays for
17 the patents-in-suit in this case is potentially very relevant
18 when we get to the damages phase of the case. Because, you
19 know, it may not -- will not surprise that you Uniloc is asking
20 for an astronomical amount of money for these patents.
21      And if the negotiation between the entities that are
22 transferring the patents shows that they were actually valued
23 at a much lower amount, that is a factor that can be considered
24 by an expert on a damages analysis.
25      Further, the financial relationship between entities that

Page 7

1  are transferring all or a portion of rights in a patent has
2  been found to be relevant to show who the real party in
3  interest is. In other words, if the rights or financial
4  interests were transferred in a way that effectively transfers
5  the entire financial interest in this litigation from one
6  entity to another, that's relevant to showing who the real
7  party in interest is.
8       And further, finally, Your Honor, I don't think they have
9  articulated any basis, any valid basis on which they could
10 redact these documents, simply because their client doesn't
11 feel that they want to produce the financial terms.
12      So we would respectfully request that the Court order full
13 production of the asset purchase agreement and the additional
14 transaction documents, ancillary agreements, and disclosure
15 schedules referenced in and incorporated in that agreement.
16      MR. FOSTER: So --
17      THE COURT: Any reply to that?
18      MR. FOSTER: Yes. Just a few short points,
19 Your Honor.
20      The transaction document, itself, that I mentioned was 50
21 to 80 pages. It's quite clear -- and speaks for itself --
22 quite clear as to who now owns the patents.
23      What Mr. Pieja is raising is a different point. He wants
24 to know: Well, okay, but who controls the purchaser, who are
25 the stockholders, board of directors? That kind of stuff.

Page 8

1       And the rules require us in the documents we file in this
2  court, to list parents and companies that own more than
3  10 percent of the shares, this kind of thing, to allow recusal
4  where appropriate. But I don't understand the relevance --
5  otherwise, the relevance to who the stockholders are of these
6  companies, and how they split up the money between them.
7       This is the kind of thing which gets my client's hackles
8  up. How is that relevant? I frankly don't have an answer to
9  that question.
10      THE COURT: Okay, here's the answer. Unless
11 somebody's got something more to say.
12      MR. PIEJA: The only point I would make, Your Honor,
13 is Mister --
14      THE COURT: If I give you a chance to speak, I give
15 him a chance to speak. So, go ahead.
16      MR. PIEJA: Okay. Mr. Foster made references to
17 disclosures that are required to be made to this Court
18 regarding ownership.
19      In fact, none of the entities that we're talking about
20 here today were ever disclosed by plaintiffs. Even though they
21 have known about this transaction since at least the beginning
22 of May, and we believe, March.
23      So I don't think it's quite fair for Mr. Foster to claim
24 that somehow we are getting this information from the mandatory
25 disclosures, when we, in fact, had to find it out on our own,

Page 9

1  and bring the issue to plaintiffs' attention.
2       THE COURT: All right.
3       Any reply to that?
4       MR. FOSTER: Yeah, Your Honor. We have filed a
5  motion with the Court to add the new party as, say, a
6  plaintiff. And that motion's already been filed with the
7  Court.
8       So other than -- Mr. Pieja said we should have done it
9  sooner; fine. But other than that, I have nothing to say.
10      THE COURT: All right. I am ready to rule now.
11      The Court has had this problem in a different case. And
12 the bottom line is that plaintiffs should produce all of this
13 material, including the dollar amounts, including all of the --
14 every single document, no redactions, so that the other side
15 can trace the bundle of rights that every entity has or
16 retained or assigned, how it got split up.
17      And there are two reasons that it's relevant. In one
18 other case, a very creative scheme was used by the plaintiff to
19 make it look like there had been an assignment that would have
20 created standing. But so many other rights were held back or
21 compromised that I said: No, that you didn't have standing.
22 Not you, but somebody else.
23      That went up to the Federal Circuit. But before they
24 argued it, the plaintiff in that case thought better of it, and
25 dismissed the case. The appeal. So I think -- I don't know,