UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNILOC USA, INC., et al.,<br><br>  Plaintiffs,<br><br>  v.<br><br>APPLE, INC.,<br><br>  Defendant. | No. C 18-00358 WHA<br>No. C 18-00360 WHA<br>No. C 18-00363 WHA<br>No. C 18-00365 WHA<br>No. C 18-00572 WHA<br><br>**ORDER RE MOTION TO SEAL** |

### INTRODUCTION

This order addresses the extent to which third-party licensing information should remain sealed from public view. To the following extent, the omnibus sealing motion is **GRANTED IN PART** and **DENIED IN PART**.

### STATEMENT

In this patent case between Uniloc USA, Inc. and Apple, Inc., we have long since moved past the merits stage. Now we continue with sealing issues. This is the fourth such sealing chapter. Three prior orders reviewed motions to seal stemming from Apple's motions to dismiss for lack of standing. The first sealing order, dated January 17, 2019, denied the motions to seal due to their overbreadth (No. C 18-00360, Dkt. No. 159). That order also granted Electronic Frontier Foundation's motion to intervene for the purpose of opposing any appeal. A second order, dated May 7, 2019, denied Uniloc leave to file a motion for

1  reconsideration (No. C 18-00360, Dkt. No. 187). The Court of Appeals for the Federal Circuit
2  partially affirmed the denial of Uniloc and Apple's sealing requests but remanded for further
3  consideration of third-party licensing material. *Uniloc 2017 LLC v. Apple, Inc.* (*Uniloc I*), 964
4  F.3d 1351 (Fed. Cir. 2020).

5  The third sealing order herein, dated December 22, 2020, found the public's right to
6  access generally outweighed the third parties' confidentiality interests and denied the sealing
7  requests (No. C 18-00360, Dkt. No. 233). On appeal, a split panel decision vacated the third
8  sealing order and remanded "to make particularized determinations as to whether third-party
9  licensing information should be sealed." That decision took issue with this Court's "blanket
10 ruling that the public has a broad right to licensing information relating to patents." *Uniloc*
11 *USA, Inc. v. Apple Inc.* (*Uniloc II*), 25 F.4th 1018, 1023–25 (Fed. Cir. 2022). This order
12 follows full briefing and oral argument and now proceeds through the sealing analysis required
13 by the Federal Circuit.

**ANALYSIS**

15 Uniloc, Apple, and EFF agree that the public has presumptive access to judicial records,
16 and that sealing information filed with a motion more than tangentially related to the merits of
17 the case requires a showing of compelling reasons. A district court must also "articulate the
18 factual basis for its ruling, without relying on hypothesis or conjecture." *Kamakana v. City &*
19 *Cty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006) (citation omitted); *see Ctr. for Auto*
20 *Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096 (9th Cir. 2016). Uniloc, Apple, and EFF
21 also agree that the disclosure of trade secrets or information that harms one's competitive
22 standing can constitute compelling reasons that justify sealing that material and that, relevant
23 to this dispute, patent licensing information is treated the same as any other type of
24 information.

25 A critical distinction here involves the interests of Uniloc versus those of third parties.
26 Apple notes, and Uniloc does not dispute, that "this issue is unique to this case: Uniloc lost the
27 ability to advocate for sealing of its own information due to its prior failure to comply with
28 [our] local rules, thereby placing the burden on third parties" (Reply Br. 8 n.4). The Court of

Appeals for the Federal Circuit affirmed the first sealing order and concluded "that there was no abuse of discretion in [this Court's] decision to deny Uniloc's requests to seal its purportedly confidential information and that of its related entities." *Uniloc I*, 964 F.3d at 1363. The instant order, accordingly, need not and will not consider *Uniloc's* interests in keeping the material under seal. The crux of our analysis is "whether the *particular bases* offered by our third parties outweigh the presumption of public access. If these bases exist here, they come not from Uniloc, but from the *third parties*" (No. C 18-00360, Dkt. No. 233, emphasis added).

Uniloc and Apple devote considerable effort to discussing the presumption of regularity. They insist that district courts have a "consistent practice" of sealing patent licenses, a practice which should be respected (*e.g.*, Br. 10–13). This argument is like saying "most judges rubber stamp stipulated sealing orders," which is true (but therein lies the problem). Everyone knows such indiscrete rubber stamping of stipulated sealing orders denies the public their right to access and does so indiscriminately. With this in mind, we proceed through a document-by-document review.

1. **CONFORMED REVENUE SHARING AND NOTE AND WARRANT PURCHASE AGREEMENT (EXHIBIT 2).**

The revenue sharing agreement structured Fortress Credit Co. LLC's funding of Uniloc's patent suits since 2014 (Exh. 2). The prior order herein dismissing Uniloc's suit based that conclusion on an analysis of the revenue sharing agreement and the fact that Uniloc had only gathered approximately $14 million in revenue between April 1, 2016, and March 31, 2017. Uniloc's failure to generate at least $20 million during that period landed it in default, which it never cured, and which divested it of standing to sue (No. C 19-00358, Dkt. No. 186).

Originally filed entirely under seal (No. C 19-00360, Dkt. Nos. 135-2, 137), the only remaining redacted information at issue here is a table spanning the last three pages of the agreement (No. C 19-00360, Dkt. No. 258-3). This table provides a summary of Uniloc's

3

license agreements as of May 10, 2017. It contains four columns listing the licensee, the date, the lump sum, and the document type, 108 licenses altogether.[1]

Following the first sealing order's denial of Uniloc's request to keep this table redacted, Uniloc contacted the licensees for all 108 licenses regarding their position on sealing this material. Two licensees agreed to make their information public (Exh. 1). Eight licensees (one of which that has two licenses listed in the table) agreed to disclose their identities but asked to maintain the confidentiality of their license payments (*ibid.*; Exhs. 41–45). Twenty-three licensees asked that all the information remain confidential (although only twenty-two of those licensees' agreements were actually listed in the table) (*see* Exh. 12). The rest of the seventy-five licensees did not respond. This order, it will turn out, will honor these requests for those who responded.

This order now addresses the trade secret issue. All agree that, generally, a trade secret is (1) information that derives independent economic value (actual or potential) from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use and (2) is subject to reasonable efforts to maintain its secrecy. *See* 18 U.S.C. § 1839; Cal. Civ. Code § 3426.1; *Clark v. Bunker*, 453 F.2d 1006, 1009 (9th Cir. 1972).

Uniloc and Apple argue that pricing terms, royalty rates, and licensing information "invariably" constitute trade secrets (Br. 9). This unconditional statement does not find support in our court of appeals' decision *In re Electronic Arts, Inc.*, 298 F. App'x 568 (9th Cir. 2008). That opinion held that the district court had erred and found a paragraph of Electronic Arts' license agreement sealable. Nowhere does the decision state information such as a pricing term *always* qualifies as a trade secret, just that information of that type "falls within the definition" of what can constitute a trade secret. *Id.* at 569. Nor is the paragraph our court of appeals considered squarely analogous to the datapoints at issue here. The material in *Electronic Arts* included several relevant terms — "pricing terms, royalty rates, and guaranteed minimum payment terms" — all in conjunction in the same paragraph, that met the two-part

---

[1] The table in the revenue sharing agreement lists 108 individual licenses, not 109 as incorrectly stated in the briefing.

4

standard for a trade secret. *Ibid.* Electronic Arts itself claimed the paragraph as its own trade secret.

Here, however, the licensees have not demonstrated that their name, the license date, and dollar amount qualify as trade secrets. Do these datapoints derive independent economic value from not being publicly known? Have the licensees put in place reasonable efforts to maintain the information's secrecy? The record fails to show. Though invited to do so, seventy-five licensees made no statement whatsoever regarding the value of or protections in place for this information. They neither filed a declaration on our docket nor responded to Uniloc's solicitations. The information is stale and it is very easy to see why the seventy-five did not respond.

To repeat, Uniloc itself has lost any right to claim this information as a trade secret (or even confidential information), a point affirmed by the Federal Circuit. *Uniloc I*, 964 F.3d at 1363.

A confidentiality provision in a license agreement would not, standing alone, establish the specific information extracted from the agreement at issue here would constitute a trade secret. Confidentiality is defined by contract; trade secrets are defined by statute. Perhaps the licensee treats the information as a trade secret, perhaps not. Our court of appeals has mandated that sealing decisions must have a *factual* basis, without reliance on hypothesis or conjecture. *Kamakana*, 447 F.3d at 1179. We have no factual basis on which to conclude the licensing information from the seventy-five silent licensees might constitute valid trade secrets.

A different calculus applies to the thirty licensees who provided a statement in support of sealing. Upon review, this order finds that twenty of those thirty licensees did not even suggest that this information qualifies as a trade secret (Exh. 1 ¶¶ 8(b), (c), (d), (e), (g), (h); ¶¶ 9(c), (e), (f), (g), (i), (m), (n), (o), (p), (q), (r), (s), (t), (v)). The analysis for these licensees is the same as for those who made no statement. These twenty licensees have not made a sufficient, affirmative showing that this material may qualify as a trade secret.

The remaining ten of the thirty licensees who provided a statement made at least a conclusory reference to trade secrets to justify sealing the material, such as referring to a

5

"proprietary" interest in the information (*id.* ¶¶ 8(a), (f); ¶¶ 9(a), (b), (d), (h), (j), (k), (l), (u)). But even crediting these statements, none of the licensees provide an adequate, factual explanation of their reasonable efforts to maintain the information's secrecy or its independent economic value. While "a declarant does not need to use those words [trade secret] as some talismanic charm" (Reply Br. 5), *some* factual basis must be provided beyond mere conclusory statements of a proprietary interest. No such basis exists.

All agree, however, that competitive harm can serve as a compelling reason to seal beyond the disclosure of trade secrets. *See Ctr. for Auto Safety*, 809 F.3d at 1097. The prior sealing order found no occasion to conduct a particularized competitive harm review. This order conducts that analysis now.

For the seventy-five silent licensees that did not submit any statement regarding their information, this order finds keeping their material under seal unjustified. Most of these licenses hail from 2010 and 2011, more than a decade ago. Only one of these seventy-five licenses comes after March 31, 2017, but that license is still more than five years old. The table does not specify how many or which Uniloc patents were subject to any particular license.

Running through Uniloc and Apple's briefing are warnings of the perils of "information asymmetry" in future license negotiations (*e.g.*, Br. 19). No doubt, Uniloc wishes to keep secret from future juries that it has licensed its patents for a small fraction of what it may claim as royalties. But, as stated, Uniloc has forfeited any interest it may have to advance such a point, a forfeiture affirmed by the Federal Circuit. The licensees themselves might prefer that other future patent plaintiffs not know how much they paid for a Uniloc license, but here that information is stale and only thirty of them requested that their payment information not be made public.

Uniloc and Apple argue the third parties made efforts to keep their information secret by entering into confidential license agreements in the first place and that they should not have to recertify their interest in secrecy (Reply Br. 8). That argument, however, would justify blanket sealing forever and "proves too much." Public access does not inherently result in competitive

6

harm. Uniloc and Apple also concede: "*Most* of these agreements include express confidentiality agreements that were requested by the licensees" (Br. 17, emphasis added). Which ones? Wasn't it really Uniloc who inserted and wanted the provision? We are left to guess. This is the type of conjectural justification *Kamakana* prohibits. Here, the face of the document itself cannot, without more, support a finding that competitive harm to a third party may result upon disclosure. This is especially true given the fact that two licensees authorized public disclosure, eight have only sought to seal the amount, and seventy-five have had ample opportunity to respond and make their voices heard, but remained silent.

Turning to the other side of the sealing equation, for the seventy-five silent licensees, Uniloc and Apple have also failed to rebut the strong presumption of public access. They assert the purpose of maintaining public access lies in ensuring that the public "understand[s] the bases for the outcome in the given case" (Br. 8). This represents merely one specific factor underlying the presumption of public access. *See Valley Broad. Co. v. U.S. Dist. Ct. for Dist. of Nev.*, 798 F.2d 1289, 1294 (9th Cir. 1986). Heeding this basis for public access alone would write off other key considerations, such as the broader goals of ensuring "a measure of accountability and for the public to have confidence in the administration of justice." *Ctr. for Auto Safety*, 809 F.3d at 1096 (citation omitted). The Supreme Court in *Press-Enterprise Co. v. Super. Ct.*, 464 U.S. 501, 508 (1984), explained that openness in judicial proceedings "enhances both the basic fairness of the [proceeding] and the appearance of fairness so essential to public confidence in the system." *See also Courthouse News Serv. v. Planet*, 947 F.3d 581, 589 (9th Cir. 2020). Uniloc and Apple in effect seek to circumscribe the raison d'être for the strong presumption of public access.

Uniloc and Apple insist that the information is unnecessary to understanding the merits of the standing victory for Apple earlier in this litigation. But the public interest in access is broader than this. Exhibit 2 was placed before the district court as part of an effort to persuade the district judge on an important motion. Specifically, Apple relied upon the licensing information in both its motions to dismiss to demonstrate Uniloc had generated less than $20 million in revenue (No. 18-00360, Dkt. No. 135 at 4 (citing table in revenue sharing

7

agreement); No. 18-00358, Dkt. No. 165 at 4 (citing licensing information in Fortress Memorandum, considered below)). *Verifying* Uniloc generated less than $20 million with *actual data* was critical to both decisions. To follow the give and take and thus the working of our judicial system, the public does have a legitimate interest in seeing the record before the district court, not just the conclusory points. *Uniloc I*, 964 F.3d at 1358; *Courthouse News*, 947 F.3d at 589.[2]

Reviewing all these considerations, for the seventy-five licensees who were invited to weigh in but elected to remain silent, this order finds the strong presumption of public access outweighs any conjectural competitive harm to those seventy-five. This licensing information will be filed on the public docket.

Next, for the following reasons, this order will seal the licensing information for the thirty licensees that did provide statements. Of those thirty licensees, twenty-two requested sealing of all their material. Breaking down that number further, of those twenty-two licensees:

- Five explicitly described potential competitive harm upon public disclosure (Exh. 1 ¶¶ 9(c), (g), (i), (n), (o));
- Eight licensees addressed competitive harm and referenced at least some level of proprietary interest in the information, such as trade secrets (*id.* ¶¶ 9(a), (b), (d), (h), (j), (k), (l), (u)); and
- Nine licensees stated their preference the information remain under seal but did not explicitly mention either trade secrets or competitive harm (*id.* ¶¶ 9(e), (f), (m), (p), (q), (r), (s), (t), (v)).

---

[2] As raised by Uniloc and Apple, the Federal Circuit said: "The district court did note that a key issue in this case was whether Unioc had received at least $20 million in royalties . . . . But that fact can be proved without opening up all the licenses that the court granted access to." *Uniloc II*, 25 F.4th at 1024. As explained in the text, our court of appeals has stated that the interests of the public are broader than that specific focus. *See, e.g.*, *Courthouse News*, 947 F.3d at 589; *see also Uniloc I*, 964 F.3d at 1358. Patent licensing information receives no special treatment in the sealing analysis and is evaluated the same as any other material.

8

Upon review, a sufficient factual basis exists (free from conjecture) for this order to conclude disclosure of this information may cause these third parties competitive harm. This decision is rooted in the fact that all twenty-two licensees responded to Uniloc's request and provided a factual basis to support Uniloc and Apple's arguments for sealing the material. Sealing is thus justified for this material given the unique circumstances of this dispute.

Similar reasoning applies for the remaining eight licensees that disclosed their identities but asked to seal their license payments. That information will remain confidential.

In sum then, this order will:

- Redact the licensee's name, date, and lump sum amount for the twenty-two licensees who submitted statements and sought to keep their information confidential;
- Redact only the lump sum amount for the eight licensees that disclosed their identities but sought to keep that lump sum information confidential; and
- Publicly disclose the remaining third-party licensing information, *i.e.*, the licensee's name, date, and lump sum, for those who remained silent.

To promote public confidence in this judicial exercise, this order will also disclose the aggregate amount paid by the licensees who sought to seal their licensing information or their license amount. This will provide confirmation of the standing order's conclusions and further insight into the administration of justice.[3]

### 2. FORTRESS MEMORANDUM (EXHIBITS 13, 15).

Next, we consider the Fortress memorandum and references thereof in Apple's motion to dismiss (Exhs. 13, 15). In Uniloc and Apple's words: "The Fortress Memorandum is a

---

[3] Thirty-one licensees submitted statements requesting that at least some of their information remain confidential, but one declarant did not have its licensing information listed in the table. The total amount of license payments for the thirty licensees who submitted statements and who had their information listed in the table is $■■■■■■. Apple stated that, from April 1, 2016, to March 31, 2017, Uniloc generated $14,608,000 in licensing revenue (No. C 19-00360, Dkt. No. 135 at 4). The Court has checked and rechecked, and the actual amount is $13,988,000. This further demonstrates the public benefit in disclosure. The total amount of license payments for the twelve licensees who provided statements and who entered into agreements with Uniloc between April 1, 2016, and March 31, 2017, is $■■■■■■.

9

detailed analysis of Uniloc created by third-party Fortress, along with a table listing the same details of fifty-five of the 109 [sic] licenses seen in the Conformed Revenue Agreement" (Br. 21). Apple cited the memorandum in its motion to dismiss regarding Uniloc's (approximately) $14 million in patent-monetization revenue and also as evidence "it was in Fortress's financial interest to continue lending money to Uniloc despite the Event of Default" (Exh. 13 at 15). Uniloc filed a declaration from one of its own attorneys purporting to speak for Fortress (No. C 18-00358, Dkt. No. 173 ¶¶ 3, 19–22).

*First*, as a concession to the shortness of life, and given that the table of license agreements in the memorandum is duplicative of the information contained in the revenue sharing agreement, this order will seal the table contained in the Fortress memorandum. The public interest will be entirely served by providing public access to the table included in the revenue sharing agreement, Exhibit 2 herein.

*Second*, this order finds Fortress has provided compelling reasons to seal the remainder of the memorandum and the narrow redaction in Apple's motion to dismiss. The memorandum contains Fortress' confidential analysis and opinions as to Uniloc and Uniloc's litigation model. This order finds public disclosure of this material may cause Fortress competitive harm by negatively impacting future negotiations and by revealing its methods for evaluating investment opportunities.

In sum, the motion to seal is **GRANTED**.

3. **JACOBS REVISED REDACTIONS DECLARATION AND THIRD-PARTY DECLARATIONS (EXHIBITS 1, 5–12).**

Uniloc submitted this Jacobs declaration with its motion for reconsideration (Exh. 1). The parties seek to redact the statements from the twenty-three licensees regarding sealing of their licensing information. Furthermore, Uniloc submitted several third-party declarations with its motion for reconsideration. These contain longer statements from eight licensees regarding the sealing of their licensing information (Exh. 5–12).

Uniloc and Apple's assertion that this material constitutes confidential trade secret material is specious. They declare these statements "are the pleas and explanations from

10

twenty-three third party licensees, asking the Court to seal their licensing information," and that the long-form declarations "explained in detail the damage that would be caused by publication of the information that relates to it" (Br. 20). But how do these statements themselves regarding the confidentiality of the licensing information constitute trade secrets? Uniloc and Apple do not and cannot explain because their assertion is wrong. These "pleas" do not have independent economic value from not being known, nor have Apple, Uniloc, or the licensees, explained the reasonable protections in place for this information.

Uniloc and Apple again force the district court judge, "heavily burdened with the task of resolving complex legal and factual disputes," "to spend large swathes of . . . time struggling to rein in overzealous efforts to seal." *Uniloc I*, 964 F.3d at 1363. The only disclosure that would conceivably cause competitive harm to these twenty-three third-party licensees would be disclosure of their identity which, as discussed above, will remain sealed in the license table. Accordingly, the only material from these exhibits this order will keep under seal is information that would reveal the licensees' identities, such as their name, the name of the declarant, references to the licensees' location, etc. (similar to the proposed redactions for Exhibit 7). The rest shall be publicly disclosed.

This order will not further spell out these redactions for Uniloc and Apple. They shall propose proper redactions in accordance with the above **FOURTEEN DAYS** after the entry of this order on the docket.

### 4. MICROSOFT SETTLEMENT AND LICENSE AGREEMENT (EXHIBITS 3, 4).

For its reply in support of its initial motion to dismiss, Apple filed a two-page excerpt from a settlement and license agreement between Microsoft and Uniloc, which it cited in the briefing (Exhs. 3, 4). After originally requesting to keep the entirety of the excerpted settlement agreement confidential and seeking extensive redactions to the reply brief, Uniloc and Apple now only seek to redact the license payments. These numbers represent either a dollar amount and/or percentage. In effect, Uniloc and Apple seek to redact five numbers in the reply brief, and three in the excerpted settlement agreement.

11

EFF does not meaningfully contest these redactions, which it describes as "narrow" (Opp. 27). Microsoft's Assistant General Counsel supplied a declaration describing the company's interests in keeping this information confidential (Exh. 45). The same reasoning laid out above for the license table applies here. The request to seal this material is **GRANTED**.

### 5. THE PALMER DEPOSITION TRANSCRIPT (EXHIBIT 14).

Finally, Apple's motion to dismiss included excerpts of the transcript for the deposition of James Palmer, a Managing Director at Fortress Investment Group. The only pending proposed redactions concern the names of three licensees. Two of these three licensees did not submit declarations regarding their information so, as explained above, their information as recited in the license table will be publicly disclosed. As such, no basis exists to seal this iteration of the information. The remaining licensee is one of the eight who disclosed their identity but sought to keep their license payments confidential. Disclosure here, in context, would reveal the approximate amount of that licensee's payment. As stated, the public interest will be entirely served by disclosure of the licensing information in the revenue sharing agreement. The motion is accordingly **GRANTED** only as to the second redacted name in the transcript (Exh. 14 at p. 119 l. 15). Otherwise, the request is **DENIED**.

## CONCLUSION

For the reasons stated, the motion is **GRANTED IN PART** and **DENIED IN PART**. In an abundance of caution, this order will be temporarily filed under seal for **FOURTEEN DAYS** to give Uniloc and Apple the opportunity to seek relief should they consider any information contained herein sealable. Afterwards, it shall be filed on the public docket.

Apple and Uniloc shall provide proposed redactions for Exhibits 5–12 within **FOURTEEN DAYS** of the date of this order.

The contested denials herein shall be **STAYED** until 28 days after all appeals of this order are exhausted. The parties shall please advise the Court when this period has run and remind the Court to effect the unsealing.

The Electronic Frontier Foundation has been of considerable assistance to the Court. The real parties herein have jointly aligned themselves against the public interest and EFF has been

12

1  of enormous help in keeping the system honest.  This order recognizes that assistance and
2  thanks EFF.
3  **IT IS SO ORDERED.**

5  Dated:  August 22, 2022.

 WILLIAM ALSUP
 UNITED STATES DISTRICT JUDGE