# EXHIBIT 2

# EXHIBIT A

[DOCUMENT SOUGHT TO BE SEALED]

EXECUTION

CONFORMED REVENUE SHARING AND NOTE AND WARRANT PURCHASE
AGREEMENT

(UNILOC USA, INC.,
UNILOC LUXEMBOURG S.A.,
UNILOC CORPORATION PTY LIMITED, and
D/A INVESTMENT HOLDINGS LLC)

DATED AS OF DECEMBER 30, 2014

AS AMENDED BY:
FIRST AMENDMENT TO REVENUE SHARE AND NOTE AND WARRANT PURCHASE
AGREEMENT, DATED AS OF FEBRUARY 24, 2015
SECOND AMENDMENT TO REVENUE SHARE AND NOTE AND WARRANT
PURCHASE AGREEMENT, DATED AS OF MAY 27, 2016
THIRD AMENDMENT TO REVENUE SHARE AND NOTE AND WARRANT PURCHASE
AGREEMENT, DATED AS OF MAY 15, 2017

62250363_5

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY                    UNILOC_APPLE_2017_18279

**TABLE OF CONTENTS**

ARTICLE I DEFINITIONS .................................................................................................. 1
    1.1.   Certain Defined Terms........................................................................................ 1
    1.2.   Other Interpretative Provisions .......................................................................... 1

ARTICLE II CLOSING AND TERMS OF THE REVENUE STREAM AND NOTES ............ 2
    2.1.   The Revenue Stream .......................................................................................... 2
    2.2.   The Notes........................................................................................................... 3
    2.3.   The Warrants...................................................................................................... 6
    2.4.   Monetization Revenues...................................................................................... 6
    2.5.   Purchase Price Allocation .................................................................................. 7
    2.6.   Taxes................................................................................................................. 8
    2.7.   Manner and Time of Payment............................................................................ 9
    2.8.   Patent License ................................................................................................... 9

ARTICLE III CONDITIONS PRECEDENT ....................................................................... 9
    3.1.   Conditions to Closing ........................................................................................ 9
    3.2.   Conditions to Subsequent Issuance of Notes ..................................................... 11

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE COMPANY ................ 12
    4.1.   Organization and Business................................................................................. 12
    4.2.   Qualification ...................................................................................................... 12
    4.3.   Operations in Conformity with Law, etc ........................................................... 12
    4.4.   Authorization and Non-Contravention ............................................................... 12
    4.5.   Intellectual Property .......................................................................................... 12
    4.6.   Material Agreements.......................................................................................... 13
    4.7.   Margin Regulations............................................................................................ 13
    4.8.   Investment Company Act ................................................................................... 13
    4.9.   USA PATRIOT Act, FCPA and OFAC ............................................................ 13
    4.10.  No Default.......................................................................................................... 14
    4.11.  Binding Effect.................................................................................................... 14
    4.12.  Disclosure ......................................................................................................... 14

ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE PURCHASERS
AND COLLATERAL AGENT ............................................................................................ 14
    5.1.   Authority ........................................................................................................... 14
    5.2.   Binding Effect.................................................................................................... 14
    5.3.   Investment Intent ............................................................................................... 15
    5.4.   Experience of the Purchaser............................................................................... 15
    5.5.   Access to Information......................................................................................... 15
    5.6    Reliance on Exemptions .................................................................................... 15

ARTICLE VI COVENANTS ............................................................................................... 16
    6.1.   Taxes and Other Charges ................................................................................... 16
    6.2.   Conduct of Monetization Activities; Minimum Monetization Revenues............. 16
    6.3.   Maintenance of Existence .................................................................................. 16

62250363_5

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY        UNILOC_APPLE_2017_18280

6.4.  Compliance with Legal Requirements ......................................................... 16
6.5.  Notices; Reports ............................................................................................ 16
6.6.  Information Rights ......................................................................................... 17
6.7.  Indebtedness .................................................................................................. 18
6.8.  Liens .............................................................................................................. 18
6.9.  Management of Patents and Patent Licenses ................................................ 18
6.10. Minimum Liquidity ....................................................................................... 19
6.11. Cash Collateral Account ............................................................................... 20
6.12. Further Assurances ........................................................................................ 20
6.13. Confidentiality .............................................................................................. 21
6.14. Use of Proceeds ............................................................................................. 22
6.15. Restricted Payments ...................................................................................... 22
6.16. Third Amendment Due Authorization and Legal Opinions .......................... 22

ARTICLE VII EVENTS OF DEFAULT ..................................................................... 22
7.1.  Events of Default .......................................................................................... 22
7.2.  Remedies Following an Event of Default ...................................................... 24
7.3.  Annulment of Defaults .................................................................................. 25
7.4.  Waivers ......................................................................................................... 26

ARTICLE VIII COLLATERAL AGENT ..................................................................... 26
8.1.  Appointment of Collateral Agent .................................................................. 26
8.2.  Collateral ...................................................................................................... 26
8.3.  Collateral Agent's Resignation ..................................................................... 27
8.4.  Concerning the Collateral Agent ................................................................... 27

ARTICLE IX GENERAL PROVISIONS ..................................................................... 28
9.1.  Expenses ........................................................................................................ 28
9.2.  Indemnity ...................................................................................................... 29
9.3.  Notices ........................................................................................................... 30
9.4.  Amendments, Consents, Waivers, etc. .......................................................... 30
9.5.  No Strict Construction ................................................................................... 31
9.6.  Certain Acknowledgments ............................................................................ 31
9.7.  Venue; Service of Process; Certain Waivers ................................................. 31
9.8.  WAIVER OF JURY TRIAL ......................................................................... 31
9.9.  Interpretation; Governing Law; etc. .............................................................. 32
9.10. Successors and Assigns ................................................................................. 32
9.11. Tax Treatment ............................................................................................... 33

APPENDICES, SCHEDULES AND EXHIBITS

Appendix I          Definitions

Schedule 2.1        Purchasers

-ii-

62250363_5

Schedule 2.2          Third Party Agreements Related to Monetization Expenses
Schedule 2.7          Wire Transfer Instructions
Schedule 4.1          Company Organization
Schedule 4.5(a)       Existing Licenses
Schedule 4.5(b)       Title Issues
Schedule 4.6          Material Agreements
Schedule 6.7          Existing Indebtedness
Schedule 9.3          Notices
Schedule I(a)         Patents
Schedule I(b)         Term C Priority Collateral

Exhibit A             Form of Note
Exhibit B             Control Agreement
Exhibit C             Form of Certificate (Payments to Cash Collateral Account)
Exhibit D              Assignment and Assumption Agreement
Exhibit E             Patent License Agreement
Exhibit F             Patent Security Agreement
Exhibit G             Security Agreement
Exhibit H             Form of Warrant Agreement
Exhibit I             Newco LLC Agreement

62250363_5

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY          UNILOC_APPLE_2017_18282

## REVENUE SHARING AND NOTE AND WARRANT PURCHASE AGREEMENT

This REVENUE SHARING AND NOTE AND WARRANT PURCHASE AGREEMENT (this "Agreement") is dated as of December 30, 2014 by and among Uniloc USA, Inc. a Texas corporation ("Issuer"), Uniloc Luxembourg S.A., a public limited liability company (*société anonyme*), incorporated under the laws of the Grand Duchy of Luxembourg, with registered office at 14, rue Edward Steichen, L-2540 Luxembourg, Grand Duchy of Luxembourg and registered with the Luxembourg Register of Commerce and Companies (R.C.S. Luxembourg) under number B 159.161 ("Uniloc Lux"), Uniloc Corporation PTY Limited ("Uniloc Aus") and D/A Investment Holdings LLC (together with Uniloc Lux and Uniloc Aus, the "Guarantors", and, collectively, with Issuer, the "Company" and each, a "Company"), Fortress Credit Co LLC as collateral agent (the "Collateral Agent"), and each Person listed on Schedule 2.1 hereto (the "Purchasers").

### RECITALS

WHEREAS, the Purchasers wish to acquire, and Uniloc USA, Inc. has agreed to grant, issue and sell to the Purchasers, (i) an interest in certain of the Company's future revenues from its patent portfolio (the "Revenue Stream") and (ii) up to $26,000,000 in aggregate original principal amount of the Issuer's term notes (the "Notes") in the form of Exhibit A hereto, in each case, subject to the terms of this Agreement;

WHEREAS, the Purchasers have agreed to purchase from Uniloc Lux and Uniloc Lux has agreed to issue and sell to the Purchasers warrants for 1.5% of the fully diluted equity of Uniloc Lux (the "Warrants") in the form of Exhibit H hereto, subject to the terms of the Agreement;

NOW THEREFORE, in consideration of the mutual agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

### ARTICLE I
### DEFINITIONS

1.1.   Certain Defined Terms.   Capitalized terms used in this Agreement and not otherwise defined shall have the meanings set forth in Appendix I.

1.2.   Other Interpretative Provisions.   Unless otherwise specified, all references to "$", "cash", "dollars" or similar references shall mean U.S. dollars, paid in cash or other immediately available funds. The definitions set forth in this Agreement are equally applicable to both the singular and plural forms of the terms defined.   The words *"hereof"*, *"herein"*, and *"hereunder"* and words of like import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  All references to time of day herein are references to New York, New York time (daylight or standard, as applicable) unless otherwise specifically provided.  Where the character or amount of any asset or liability or item of income or expense is required to be determined or any consolidation or other accounting computation is required to be made for the purposes of this Agreement, it shall be done in accordance with GAAP except where such principles are inconsistent with the

the Company shall remit 200% of the amount described in the foregoing clause (y) to the relevant taxation authority or other authority in accordance with applicable law.  Within 30 days after the date of any payment of such, the Company shall furnish to the Purchasers the original or certified copy of a receipt evidencing payment thereof.  For the avoidance of doubt, the intent of the foregoing provision is to limit the Company's obligation to gross up any withholding required on distributions on the Warrants or Warrant Shares to 50% of the amount of any such required withholding.  In the event that it appears that any withholding will be required on payments on the Warrants or Warrant Shares, the parties agree to use commercially reasonable efforts to work together in good faith to arrive at an alternative structure that eliminates or reduces any such withholding requirement, with the overall goal of minimizing the cost to the Purchasers and the Company associated with any such withholding and the Company's obligations with respect thereto.

The Company shall timely indemnify any Purchaser against any cost, loss or liability that such Purchaser incurs in relation to the payment of stamp, registrations or similar taxes arising from the execution, delivery or enforcement of, or otherwise with respect to, the Documents.

2.7.   <u>Manner and Time of Payment</u>.  All payments to the Purchasers shall be made by wire transfer or other same day funds, without set off, not later than 2:00 p.m. on the day such payment is due, in accordance with the payment instructions set forth on <u>Schedule 2.7</u>.

2.8.   <u>Patent License</u>.  Effective as of the Closing Date, the Company shall grant to the Collateral Agent, for the benefit of the Secured Parties, a non-exclusive, royalty free, license (including the right to grant sublicenses) with respect to the Patents, which shall be evidenced by, and reflected in, the Patent License Agreement.  The Collateral Agent and the Secured Parties agree that the Collateral Agent shall only use such license following an Event of Default.

## ARTICLE III
## CONDITIONS PRECEDENT

3.1.   <u>Conditions to Closing</u>.   The obligation of each Purchaser to purchase its respective pro rata share of the Revenue Stream, the Notes and the Warrants on the Closing Date is subject to the satisfaction of the conditions set forth in this <u>Section 3.1</u>:

3.1.1.   <u>Deliveries.</u>  Each Company (and each of its Subsidiaries, as applicable) shall have delivered to each Purchaser and the Collateral Agent fully executed (where applicable) copies of the following:

3.1.1.1.  this Agreement;

3.1.1.2.  the Notes;

3.1.1.3.  the Security Agreement;

3.1.1.4.  the Patent License Agreement;

3.1.1.5.  the Patent Security Agreement;

-9-

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY                    UNILOC_APPLE_2017_18291

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF THE COMPANY**

In order to induce the Purchasers to purchase the Revenue Stream, the Notes and the Warrants, each Company hereby represents and warrants to the Purchasers as of the Closing Date that:

4.1.    <u>Organization and Business</u>.  Each Company is (a) a duly organized and validly existing corporation or limited liability company, (b) in good standing under the laws of the jurisdiction of its incorporation or organization, and (c) has the power and authority, corporate or otherwise, necessary (i) to enter into and perform this Agreement and the Documents to which it is a party, and (ii) to carry on the business now conducted or proposed to be conducted by it. Except as listed on <u>Schedule 4.1</u>, the Issuer has no Subsidiaries and Uniloc Aus has no Subsidiaries other than the Issuer.  <u>Schedule 4.1</u> sets forth each entity in which any Company holds an interest, directly or indirectly, and sets forth the ownership of all equity securities of each Company and each other such entity (including joint venture, membership or partnership interests, and including convertible securities, options or warrants).

4.2.    <u>Qualification</u>.  Each Company is duly and legally qualified to do business as a foreign corporation or limited liability company and is in good standing in each state or jurisdiction in which such qualification is required and is duly authorized, qualified and licensed under all laws, regulations, ordinances or orders of public authorities, or otherwise, to carry on its business in the places and in the manner in which it is conducted.

4.3.    <u>Operations in Conformity with Law, etc</u>.  The operations of each Company as now conducted or proposed to be conducted are not in violation in any material respect of, nor is the Company in default in any material respect under, any Legal Requirement.

4.4.    <u>Authorization and Non-Contravention</u>.  Each Company has taken all corporate, limited liability or other action required to execute, deliver and perform this Agreement and each other Document. All necessary consents, approvals and authorizations of any governmental or administrative agency or any other Person of any of the transactions contemplated hereby shall have been obtained and shall be in full force and effect.  This Agreement and each other Document does not (i) contravene the terms of any Company's Organization Documents, (ii) conflict with or result in any breach or contravention of, or the creation of any Lien under, or require any payment to be made under (x) any Contractual Obligation of any Company or its applicable Subsidiaries or (y) any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which the Company is subject or (iii) violate any Legal Requirement.

4.5.    <u>Intellectual Property</u>.  As of the Closing Date, subject solely to the licensing agreements set forth on <u>Schedule 4.5(a)</u> (the "<u>Existing Licenses</u>") (true and complete copies of which have been delivered to the Purchasers), Uniloc Lux is the entire, valid, sole and exclusive beneficial and record owner of all right, title and interest to all of the Patents with good and marketable title free and clear of any and all Liens, charges and encumbrances, including, without limitation, that other than the Existing Licenses, there are no pledges, assignments, licenses, springing licenses, options, non-assertion agreements, earn-outs, monetization

-12-

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY          UNILOC_APPLE_2017_18294

agreements, profit and revenue sharing arrangements, derivative interests, fee and recovery splitting agreements, registered user agreements, shop rights and covenants by Uniloc Lux not to sue third persons, and Issuer has the power to bring and sustain action and recover for past, present and future infringement without having to join any other third party and that no provision of any Existing License will materially restrict the ability of the Issuer to pursue Monetization Activities. Uniloc Lux is listed as record owner of all of the Patents and the recordings in the United States Patent and Trademark Office do not reflect any defects in chain-of-title or unreleased liens, except as set forth on Schedule 4.5(b) .  All of the Patents are subsisting and have not been adjudged invalid or unenforceable, in whole or in part, and none of the Patents are at this time the subject to any challenge to their validity or enforceability.  To the knowledge of the Company, the Patents are valid and enforceable.  The Company has no notice of any lawsuits, actions or opposition, cancellation, revocation, re-examination or reissue proceedings commenced or threatened with reference to any of the Patents.

4.6.   Material Agreements.   Schedule 4.6 sets forth each agreement relating to the purchase or other acquisition of any Patent, including seller notes issued in connection with such acquisition, and any other material agreement relating to any Patent (other than the Existing Licenses).  Each such agreement is in full force and effect for the benefit of the Company and to the knowledge of the Company there are no material defaults under any such agreement.

4.7.   Margin Regulations.  The Company is not engaged, nor will it engage, principally or as one of its important activities, in the business of purchasing or carrying Margin Stock, or extending credit for the purpose of purchasing or carrying Margin Stock, and the proceeds of the Notes, the Revenue Stream and the Warrants will not be used for any purpose that violates Regulation U of the Board of Governors of the United States Federal Reserve System.

4.8.   Investment Company Act.   The Company is not, and is not required to be, registered as an "investment company" under the Investment Company Act of 1940.

4.9.   USA PATRIOT Act, FCPA and OFAC.

4.9.1.   To the extent applicable, the Company is in compliance, in all material respects, with (i) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto and (ii) the USA Patriot Act.

4.9.2.   No part of the proceeds of the Notes or the purchase price for the Revenue Stream will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

4.9.3.   None of the Company nor, to the actual knowledge of the Company, any director, officer, agent, employee or controlled Affiliate of the Company, is currently the subject of any U.S. sanctions program administered by the Office of Foreign Assets

-13-

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY                    UNILOC_APPLE_2017_18295

Control of the United States Department of the Treasury ("OFAC"); and the Company will not directly or indirectly use the proceeds of the Notes or otherwise make available such proceeds to any Person, for the purpose of financing the activities of any Person currently the subject of any U.S. sanctions program administered by OFAC, except to the extent licensed or otherwise approved by OFAC.

4.10.   No Default.   No Default or Event of Default exists or would result from the incurring of any Obligations by the Company or the grant or perfection of Liens on the Collateral.  The Company is not in default under or with respect to any Contractual Obligation in any respect which, individually or together with all such defaults, would reasonably be expected to have a Material Adverse Effect.

4.11.   Binding Effect.   This Agreement and each other Document constitute the legal, valid and binding obligations of each Company, enforceable against such Company in accordance with their respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency, or similar laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

4.12.   Disclosure.   To the best knowledge of the Company, no report, financial statement, certificate or other written information furnished by or on behalf of the Company (other than projected financial information, *pro forma* financial information and information of a general economic or industry nature) to any Purchaser or the Collateral Agent in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or any other Document (as modified or supplemented by other information so furnished) when taken as a whole contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein (when taken as a whole), in the light of the circumstances under which they were made, not materially misleading.  With respect to projected financial information and *pro forma* financial information, the Company represents that such information was prepared in good faith based upon assumptions believed to be reasonable at the time of preparation; it being understood that such projections may vary from actual results and that such variances may be material.

### ARTICLE V
### REPRESENTATIONS AND WARRANTIES OF THE PURCHASERS AND COLLATERAL AGENT

Each Purchaser, for itself and for no other Purchaser, and the Collateral Agent hereby represents and warrants to the Company as of the Closing Date:

5.1.   Authority.   The Purchaser and the Collateral Agent, as the case may be, has the power and authority, corporate or otherwise, necessary to enter into and perform this Agreement and the Documents to which it is a party.

5.2.   Binding Effect.   This Agreement and each other Document constitute the legal, valid and binding obligations of the Purchaser and the Collateral Agent, enforceable against the Purchaser or the Collateral Agent as the case may be in accordance with their respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency, or similar laws

-14-

62250363_5

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY                    UNILOC_APPLE_2017_18296

set forth herein in order to determine the availability of such exemptions and the eligibility of the Purchaser to acquire its Notes, the Revenue Stream and the Warrants.

## ARTICLE VI
## COVENANTS

Until all of the Company's obligations with respect to the Notes and the Revenue Stream, have been paid in full in cash, the Company shall comply with the covenants set forth in this Article VI.

6.1.   Taxes and Other Charges.  The Company shall duly pay and discharge, or cause to be paid and discharged, before the same becomes in arrears, all taxes, assessments and other governmental charges imposed upon such Person and its properties, sales or activities, or upon the income or profits therefrom; *provided*, *however*, that any such tax, assessment, charge or claim need not be paid if the validity or amount thereof shall at the time be contested in good faith by appropriate proceedings and if such Person shall, in accordance with GAAP or applicable generally accepted accounting principles, have set aside on its books adequate reserves with respect thereto; *provided*, *further*, that the Company shall pay or bond, or cause to be paid or bonded, all such taxes, assessments, charges or other governmental claims immediately upon the commencement of proceedings to foreclose any Lien which may have attached as security therefor (except to the extent such proceedings have been dismissed or stayed).

6.2.   Conduct of Monetization Activities; Minimum Monetization Revenues.

6.2.1.   The Issuer shall undertake its best efforts to diligently pursue the monetization of the Patents and shall provide regular updates to the Purchasers and their advisors, and shall consult with Purchasers and their advisors on request, as to such activities.

6.2.2.   From the Closing Date through December 31, 2016, the Company shall have received at least $20,000,000 in Actual Monetization Revenues.  As of March 31, 2017 and the last day of each fiscal quarter thereafter, the Company shall have received at least $20,000,000 in Actual Monetization Revenues during the four fiscal quarter period ending on such date.

6.3.   Maintenance of Existence.  The Company shall do all things necessary to preserve, renew and keep in full force and effect and in good standing its legal existence and authority necessary to continue its business.

6.4.   Compliance with Legal Requirements.  The Company shall comply in all material respects with all valid Legal Requirements applicable to it, except where compliance therewith shall at the time be contested in good faith by appropriate proceedings.

6.5.   Notices; Reports.

6.5.1.   Certain Notices.  The Company shall, promptly following having notice or knowledge thereof, furnish to each of the Purchasers and such information as they may

-16-

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY                    UNILOC_APPLE_2017_18298

reasonably request concerning the Company's Monetization Activities and Actual Monetization Revenues, including without limitation the following:

      6.5.1.1.   any dispute, litigation, investigation, suspension or any administrative or arbitration proceeding by or against the Company for an amount in excess of $500,000 or affecting the Company's ownership rights with respect to the Patents; and

      6.5.1.2.   promptly upon acquiring knowledge thereof, the existence of any Default or Event of Default, specifying the nature thereof and what action the Company has taken, is taking or proposes to take with respect thereto.

Each notice pursuant to this Section shall be accompanied by a statement by an Authorized Officer of the Company, on behalf of the Company, setting forth details of the occurrence referred to therein, and stating what action the Company or other Person proposes to take with respect thereto and at what time.  Each notice under <u>Section 6.5.1.2</u> shall describe with particularity any and all clauses or provisions of this Agreement or other Document that have been breached or violated.

      6.5.2.   <u>Certain Reports</u>.  The Issuer shall cause to be furnished to each of the Purchasers the following:

      6.5.2.1.   no later than the 15th day of every month, a report calculating in detail its Actual Monetization Revenues, in form and substance reasonably satisfactory to the Majority Purchasers;

      6.5.2.2.   copies of any demand, cease and desist or other similar letter and copies of any material filing in any litigation or arbitration relating to the Patents by or against the Company that is not subject to an "attorneys' eyes only" or other protective order, as soon as reasonably practical after receipt thereof or, in the case of any material letter sent or material filing made by the Company, which is not subject to an "attorneys' eyes only" or other protective order, as early as practical prior to the date such letter is to be sent or such filing is to be made;

      6.5.2.3.   promptly (and in any event within 10 Business Days) after execution thereof, copies of all judgments, settlement agreements or licenses with respect to the Patents; and

      6.5.2.4.   promptly (and in any event within 10 Business Days), such additional business, financial, corporate affairs and other information as the Majority Purchasers may from time to time reasonably request.

Subject to the preservation of any privilege, the Company shall authorize and direct any legal counsel or consultant engaged by it to discuss the status of the Company's Monetization Activities with the Purchasers and the Collateral Agent.

      6.6.   <u>Information Rights</u>.

-17-

62250363_5

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY      UNILOC_APPLE_2017_18299

6.6.1.   Upon request of the Majority Purchasers, the Company shall permit any Purchaser and any Purchaser's duly authorized representatives and agents to visit during normal business hours and inspect any of its property, corporate books, and financial records related to the Patents, to examine and make copies of its books of accounts and other financial records related to the Patents and its Monetization Activities and Actual Monetization Revenues, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its managers, officers, employees and independent public accountants (and by this provision the Company hereby authorizes such accountants to discuss with the Purchasers the finances and affairs of the Company so long as (i) an officer or manager of the Company has been afforded a reasonable opportunity to be present for such discussion and (ii) such accountants shall be bound by standard confidentiality obligations), in each case related to the Patents and the Monetization Activities and Actual Monetization Revenues. In addition, upon request of the Majority Purchasers from time to time, and subject to any claims of privilege, the Company shall provide the Purchasers with a status update of any material development in any litigations or any administrative or arbitration proceeding related to the Patents.  All costs and expenses incurred by the Purchasers and their duly authorized representatives and agents in connection with the exercise of the Purchasers' rights pursuant to this Section 6.6 shall be paid by the Company.

6.7.   Indebtedness.  The Company shall not create, incur, assume or otherwise become or remain liable with respect to any Indebtedness that is secured by the Patents or any rights related thereto.  The Company shall not incur any other Indebtedness, except for:

6.7.1.   Indebtedness in respect of the Obligations;

6.7.2.   unsecured trade payables that are not evidenced by a promissory note and are incurred in the Ordinary Course of Business;

6.7.3.   the existing Indebtedness set forth on Schedule 6.7; and

6.7.4.   additional unsecured Indebtedness that is subordinated to the rights of the Purchasers under this Agreement pursuant to an agreement in form and substance satisfactory to the Majority Purchasers.

6.8.   Liens.  The Company shall not create, incur, assume or suffer to exist any Lien upon any Patent other than the following ("Permitted Liens"):

6.8.1.    Liens securing the Obligations

6.8.2.   the Existing Licenses and other non-exclusive licenses that are entered into pursuant to the Company's Monetization Activities and otherwise in compliance with this Agreement, and

6.8.3.   the Lien to Alexander H. Good.

6.9.   Management of Patents and Patent Licenses.

-18-

62250363_5

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY                    UNILOC_APPLE_2017_18300

6.9.1.   Dispositions.   The Company shall not make any Disposition of any Patents other than (i) entering into settlement agreements or non-exclusive licensing arrangements with respect to the Patents in pursuit of the Monetization Activities, (ii) sales of the Company's proprietary hardware and software products in the ordinary course of business *provided*, for the avoidance of doubt, that no such arrangements shall permit the use of any Patents other than as required for the sale of such products; and (iii) the entry into exclusive license agreements or sales of Patents with the written consent of the Majority Purchasers such consent not to be unreasonably withheld. For the avoidance of doubt, proceeds of any Disposition shall constitute Actual Monetization Revenues. The Company shall include in any Disposition (other than outright sales of Patents) a prohibition against any sublicenses, and a provision that terminates any such arrangement upon a Change of Control of the sublicensee.

6.9.2.   Preservation of Patents.   (a) The Company shall, at its own expense, take all reasonable steps to pursue the registration and maintenance of each Patent and shall take all reasonably necessary steps to preserve and protect each Patent and (b) the Company shall not do or permit any act or knowingly omit to do any act whereby any of the Patents may lapse, be terminated, or become invalid or unenforceable or placed in the public domain.  At its option, the Collateral Agent or the Majority Purchasers may, at the Company's expense, take all reasonable steps to pursue the registration and maintenance of each Patent and take all reasonably necessary steps to preserve and protect each Patent and the Company hereby grants the Collateral Agent a power-of-attorney to take all steps in the Company's name in furtherance of the foregoing; *provided* that the foregoing shall not be interpreted as excusing the Company from the performance of, or imposing any obligation on the Collateral Agent or the Majority Purchasers to cure or perform any obligation of the Company; *provided further* that the Collateral Agent shall give the Company prompt written notice following any action taken by the Collateral Agent under this Section 6.9.2, and shall endeavor to the advance written notice where feasible. Notwithstanding the foregoing, the Company shall not be required to preserve the registration of any Patent that it determines is not necessary for its pursuit of its business objectives so long as the Company offers to assign such Patent to Fortress for no consideration prior to permitting any Patent to lapse, terminate or become invalid, unenforceable or placed in the public domain, with such first offer to be made within a reasonable time frame prior to the date on which such result would occur to permit time for Fortress to consider such offer and for the parties to effect any such transfer.

6.9.3.   Entry into Agreements.   Neither the Company nor any Affiliate of the Company shall enter into any contract or other agreement with respect to the Patents that contains confidentiality provisions prohibiting or otherwise restricting the Company or such Affiliate from disclosing the existence and content of such contract or other agreement to the Purchasers and their counsel.

6.10.   Minimum Liquidity.   Uniloc USA, Inc. and Uniloc Lux together, shall maintain not less than One Million Dollars ($1,000,000) in unrestricted cash and Cash Equivalents ("Liquidity") (not including amounts on deposit in the Cash Collateral Account except to the extent the Uniloc USA, Inc. and Uniloc Lux are entitled to such amounts), and shall provide monthly certifications demonstrating such Liquidity.

-19-

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY                    UNILOC_APPLE_2017_18301

6.11.   <u>Cash Collateral Account</u>.  Within 30 days following the Closing Date, the Issuer shall open a depository account (the "<u>Cash Collateral Account</u>") with U.S. Bank, N.A. which Cash Collateral Account shall be subject to a control agreement, substantially in the form of <u>Exhibit B</u> (and with such other changes as may be approved by the Collateral Agent and the Company) (the "<u>Control Agreement</u>"), between the Company, U.S. Bank, N.A. and the Collateral Agent.  The Issuer shall cause all Actual Monetization Revenues to be deposited into such Cash Collateral Account, shall provide instructions to each payor of Actual Monetization Revenues to directly deposit any Actual Monetization Revenues into the Cash Collateral Account, and the Issuer and Uniloc Lux hereby authorize the Majority Purchasers to inform any payor of Actual Monetization Revenues of the Company's obligation to direct all Actual Monetization Revenues to the Cash Collateral Account as required hereunder. On each deposit of Actual Monetization Revenues to the Cash Collateral Account, the Issuer shall deliver an officer's certificate in the form of <u>Exhibit C</u> to the Collateral Agent detailing the source and nature of such Actual Monetization Revenues and setting forth the Company's calculation of the required application of the resulting Actual Monetization Revenues. On a monthly basis on and after the Closing Date, but no later than the 15th day of each month, the Collateral Agent shall deliver to the Issuer a written statement (each a "<u>Collateral Agent Statement</u>") with reasonable detail showing the amounts applied by the Collateral Agent in the Cash Collateral Account for the prior month to the payment of the Notes or, after the payment in full of the Notes, the payments made to Purchasers,  and payments to the Issuer in respect of the Actual Monetization Revenues.  The Cash Collateral Account shall be under the sole control of the Collateral Agent and neither the Issuer nor Uniloc Lux may have withdrawal rights with respect to, or otherwise control of, the Cash Collateral Account; <u>provided</u> that the Collateral Agent shall make withdrawals from the Cash Collateral Account promptly following the deposit of any Actual Monetization Revenues, and will apply such Actual Monetization Revenues to amounts due hereunder in accordance with this Agreement, and will release any excess amounts to the Issuer. The Company shall have access to account statements from the depositary bank concerning the Cash Collateral Account.

6.12.   <u>Further Assurances</u>.  Upon the reasonable request of the Majority Purchasers or the Collateral Agent, the Company shall (i) correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Document or other document or instrument relating to any Collateral, and (ii) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Collateral Agent or Majority Purchasers may reasonably request from time to time in order to carry out the purposes of the Documents. Promptly upon the Company or Uniloc Lux acquiring any new Subsidiary, such Person shall cause such Subsidiary to execute the Collateral Documents and any other documentation requested by the Collateral Agent, and to take any action reasonably requested to grant to the Collateral Agent, and perfected, liens on its material assets.

6.12.1.   Within 60 days after the Closing Date, Uniloc Aus agrees to contribute its equity in Uniloc USA, Inc. to a newly created Delaware limited liability company and, to enter into a limited liability company operating agreement for such newly formed limited liability company substantially in the form attached hereto as <u>Exhibit I</u> and to cause such entity to execute a joinder of the Documents.

62250363_5

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY                     UNILOC_APPLE_2017_18302

6.12.2.   Within 90 days after the Closing Date, and at the Company's sole expense, Uniloc Lux shall cause the chain of title issues reflected on Schedule 4.5(b) to be remedied, and shall execute and deliver to the Collateral Agent an updated Patent License Agreement and Patent Security Agreement reflecting the correct filings.

6.12.3.   Within 90 days after the Closing Date, and at the Company's sole expense, Uniloc Lux shall cause to be filed in the applicable foreign filing offices any filings required to perfect Collateral Agent's first priority lien in the Patents in China, Germany and the United Kingdom. For any other foreign jurisdiction, at the Purchasers' expense, the Collateral Agent may cause any other filings required to perfect a first priority lien in the Patents in such other jurisdictions and Uniloc Lux will take any actions reasonably requested by the Collateral Agent from time to time in order to carry out such filings.

6.12.4.   Within 30 days after the Closing Date, and at the Company's sole expense, Uniloc Lux and Uniloc USA, Inc. shall complete an amendment to the License and Services Agreement dated January 1, 2013, on terms acceptable to the Majority Purchasers.

6.12.5.   Within 60 days after the Closing Date, Uniloc, USA, Inc. shall have caused the dissolution of each of its Subsidiaries, and shall have caused such Subsidiaries' assets, if any, to be distributed to Uniloc USA, Inc.

6.12.6.   Within 30 days after the Closing Date, and at the Company's sole expense, the Issuer and D/A Investment Holdings LLC shall have delivered to the Purchasers a legal capacity opinion of counsel for the Issuer and D/A Investment Holdings LLC addressed to the Collateral Agent and Purchasers in customary form and otherwise in form and substance reasonably satisfactory to the Collateral Agent and Purchasers.

6.13.   Confidentiality.   Each party hereto will hold, and will cause its respective Affiliates and its and their respective directors, officers, employees, agents, members, investors, auditors, attorneys, financial advisors, other consultants and advisors and assignees to hold, in strict confidence, unless disclosure to a regulatory authority is necessary in connection with any necessary regulatory approval, examination or inspection or unless disclosure is required by judicial or administrative process or, in the written opinion of its counsel, by other requirement of law or the applicable requirements of any regulatory agency or relevant stock exchange, all non-public records, books, contracts, instruments, computer data and other data and information (collectively, "Information") concerning the other party hereto furnished to it by or on behalf of such other party or its representatives pursuant to this Agreement (except to the extent that such information can be shown to have been (1) previously known by such party on a non-confidential basis or becomes available to such party on a non-confidential basis, (2) publicly available through no fault of such party or (3) later lawfully acquired from other sources by such party), and neither party hereto shall release or disclose such Information to any other person, except on a confidential basis to its officers, directors, employees, agents, members, investors, Affiliates, auditors, attorneys, financial advisors, other consultants and advisors and except in connection with any proposed assignment or participation of the rights of a Purchaser under this

-21-

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY          UNILOC_APPLE_2017_18303

Agreement made in accordance with Section 9.10.2, provided such prospective assignee or participant has agreed to be bound by the confidentiality provisions consistent with those set forth herein.

6.14.   Use of Proceeds.  The proceeds of the Notes shall be used to pay expenses of the Company's pursuant of Monetization Activities (or to reimburse the Company for the payment of such expenses), for growth capital, for working capital and for other general corporate purposes that are not in violation of this agreement.

6.15.   Restricted Payments.  No Company shall make, nor shall any Company permit any Subsidiary of such Company to make, directly or indirectly any Restricted Payment, except (i) Restricted Payments from a Subsidiary of a Company to such Company and (ii) Restricted Payments made out of Excess Liquidity.  The applicable Company shall provide the Purchasers with not less than 10 Business Days prior written notice prior to making any Restricted Payment under clause (ii) above, which notice shall be accompanied by a certification setting forth the calculation of the Liquidity Reserve Amount and Excess Liquidity supporting such proposed Restricted Payment, in detail satisfactory to the Purchasers.

6.16.   Third Amendment Due Authorization and Legal Opinions. Company shall deliver to the Collateral Agent and the Purchasers customary evidence of due authorization as well as legal opinions, in customary form and otherwise in form and substance reasonably satisfactory to the Collateral Agent and the Purchasers regarding the transactions contemplated by the Third Amendment to Revenue Sharing and Note and Warrant Purchase Agreement, dated as of May 15, 2017, no later than May 26, 2017.

### ARTICLE VII
### EVENTS OF DEFAULT

7.1.   Events of Default.  Each of the following events is referred to as an "Event of Default":

7.1.1.   Payment.  The Company shall fail to make any payment due hereunder within 3 Business Days of when such payment is due and payable.

7.1.2.   Other Covenants.  The Company shall (x) fail to perform or observe any of the covenants or agreements contained in Article VI or (y) fail to perform or observe any of the covenants or agreements elsewhere in this Agreement or in any other Document (other than those covenants or agreements specified in clause (x) above) such failure continues for thirty days after the earlier of (i) written notice to the Company by the Collateral Agent or any Purchaser of such failure or (ii) knowledge of the Company of such failure.

7.1.3.   Representations and Warranties.  Any representation or warranty of or with respect to the Company, pursuant to or in connection with any Document, or in any financial statement, report, notice, mortgage, assignment or certificate delivered by the Company so representing to the other parties hereto in connection herewith or therewith, shall be false in any material respect on the date as of which it was made.

-22-

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY                    UNILOC_APPLE_2017_18304

7.1.4.    Cross Default.  Prior to the Maturity Date, any event of default, after giving effect to any applicable grace, cure, or waiver period specified in the underlying document, with respect to any Indebtedness in excess of $500,000 of the Company that is on account of a default in any payment under such Indebtedness shall occur and be continuing.

7.1.5.    Liquidation; etc. Any Company shall initiate any action to dissolve, liquidate or otherwise terminate its existence.

7.1.6.    Change of Control.  A Change of Control shall have occurred.

7.1.7.    Judgments.  A final judgment (a) which, with other outstanding final judgments against the Company, exceeds an aggregate of $500,000 shall be rendered against the Company or (b) which grants injunctive relief that results, or creates a material risk of resulting, in a Material Adverse Effect and in either case if (i) within 60 days after entry thereof (or such longer period permitted under the terms of such judgment), such judgment shall not have been discharged or execution thereof stayed pending appeal or (ii) within 60 days after the expiration of any such stay, such judgment shall not have been discharged.

7.1.8.    Bankruptcy, etc.  Any Company shall:

7.1.8.1. commence a voluntary case under the Bankruptcy Code or authorize, by appropriate proceedings of its board of directors or other governing body, the commencement of such a voluntary case;

7.1.8.2. (i) have filed against it a petition commencing an involuntary case under the Bankruptcy Code that shall not have been dismissed within 60 days after the date on which such petition is filed or (ii) file an answer or other pleading within such 60-day period admitting or failing to deny the material allegations of such a petition or seeking, consenting to or acquiescing in the relief therein provided or (iii) have entered against it an order for relief in any involuntary case commenced under the Bankruptcy Code;

7.1.8.3. seek relief as a debtor under any applicable law, other than the Bankruptcy Code, of any jurisdiction relating to the liquidation or reorganization of debtors or to the modification or alteration of the rights of creditors, or consent to or acquiesce in such relief;

7.1.8.4. have entered against it an order by a court of competent jurisdiction (i) finding it to be bankrupt or insolvent, (ii) ordering or approving its liquidation or reorganization as a debtor or any modification or alteration of the rights of its creditors or (iii) assuming custody of, or appointing a receiver or other custodian for, all or a substantial portion of its property; or

7.1.8.5. make an assignment for the benefit of, or enter into a composition with, its creditors, or appoint, or consent to the appointment of, or

-23-

62250363_5

suffer to exist a receiver or other custodian for, all or a substantial portion of its property.

7.1.8.6.   Uniloc Lux shall have appointed:

(a)     a liquidator, trustee in bankruptcy, judicial custodian, compulsory manager, receiver, administrator receiver, administrator or similar officer includes any:

(i)     *juge-commissaire* or insolvency receiver (*curateur*) appointed under the Luxembourg Code of Commerce;

(ii)     *liquidateur* appointed under Articles 141 to 151 (inclusive) of the law of August 10, 1915 on commercial companies, as amended;

(iii)     *juge-commissaire* or *liquidateur* appointed under Article 203 of the law of August 10, 1915 on commercial companies, as amended;

(iv)     *commissaire* appointed under the Grand-Ducal decree of 24 May 1935 on the controlled management regime or under Articles 593 to 614 (inclusive) of the Luxembourg Code of Commerce; and

(v)     *juge délégué* appointed under the Luxembourg act of 14 April 1886 on the composition to avoid bankruptcy, as amended;

(b)     a winding-up, administration or dissolution includes, without limitation, bankruptcy (*faillite*), liquidation, composition with creditors (*concordat preventif de faillite*), moratorium or reprieve from payment (*sursis de paiement*) and controlled management (*gestion contrôlée*); and

(c)     a person being unable to pay its debts includes that person being in a state of cessation of payments (*cessation de paiements*).

7.1.9.   <u>Collateral</u>.   Any material provision of any Document shall for any reason cease to be valid and binding on or enforceable against the Company or the Company shall so state in writing or bring an action to limit its obligations or liabilities thereunder; or any Collateral Document shall for any reason (other than pursuant to the terms thereof) cease to create a valid security interest in the Collateral purported to be covered thereby or such security interest shall for any reason (other than the failure of the Collateral Agent or the Purchasers to take any action within its control) cease to be a perfected and first priority security interest subject only to Permitted Liens and such failure shall continue for thirty days after the earlier of (i) written notice to the Company by the Collateral Agent or any Purchaser of such failure or (ii) knowledge of the Company of such failure.

7.2.   <u>Remedies Following an Event of Default</u>.   If any one or more Events of Default shall occur and be continuing, then in each and every such case:

7.2.1.   <u>Specific Performance; Exercise of Rights</u>.   The Majority Purchasers (or the Collateral Agent, acting at the direction of the Majority Purchasers) may proceed to protect and enforce such party's rights by suit in equity, action at law and/or other appropriate proceeding, either for specific performance of any covenant or condition contained in any Document, or in aid of the exercise of any power granted in any

62250363_5

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY          UNILOC_APPLE_2017_18306

Document, including directing the Company to take any action requested by the Majority Purchasers (or the Collateral Agent, acting at the direction of the Majority Purchasers) in any Monetization Activity regarding the Patents;

      7.2.2.   Acceleration.  The Majority Purchasers may, by notice in writing to the Company, declare the remaining unpaid amount of the then-outstanding Notes, together with accrued and unpaid interest and fees thereon, and the balance of the Revenue Stream, to be immediately due and payable; *provided* that if a Bankruptcy Event of Default pursuant to Section 7.1.8 shall have occurred, such amounts shall automatically become immediately due and payable; and provided, that in such event, the Company shall immediately and unconditionally be obligated to pay, as liquidated damages with respect to the Revenue Stream, the maximum amount of the Revenue Stream in full, in cash, i.e., the Issuer shall pay to the  Purchasers in respect of the Revenue Stream $23,400,00, less any amounts previously applied to the Revenue Stream.

      7.2.3.   Standstill.  Upon notice in writing from the Majority Purchasers, the Company shall not enter into any new pledges, assignments, licenses, springing licenses, options, non-assertion agreements, earn-outs, monetization agreements, profit and revenue sharing arrangements, derivative interests, fee and recovery splitting agreements, registered user agreements, shop rights and covenants by the Company not to sue third persons with respect to any of the Patents; and

      7.2.4.   Cumulative Remedies.  To the extent not prohibited by applicable law which cannot be waived, each party's rights hereunder and under the other Documents shall be cumulative;

*provided* that, effective upon the Majority Purchasers (or the Collateral Agent, acting at the direction of the Majority Purchasers) enforcing any such rights or remedies under this Agreement or any other Document, or under applicable law, the Purchasers and the Collateral Agent shall (1) grant, and do hereby grant, to the Company a non-exclusive, royalty-free, world-wide license (with the right to sublicense to third parties under the Existing Licenses and the sale of proprietary products and any other licenses entered into in compliance with this Agreement) to the Patents, which license shall be non-revocable by any third party transferee or any other person or entity that acquires rights in the Patents (by foreclosure or otherwise) at any time following such exercise of rights or remedies, and (2)  require as a condition to the effectiveness of any such transfer or assignment (by foreclosure or otherwise) of the Patents or rights in the Patents, that the applicable transferee or assignee acknowledge and agree to the non-revocable grant to the Company of the perpetual license of the type described in the immediately preceding clause (1), which acknowledgement and agreement by such transferee or assignee shall be made in a writing, signed by a duly authorized officer of such transferee or assignee, made to and for the express benefit of the Company, and the original of which shall be delivered by the Purchasers or the Collateral Agent to the Company promptly following any such transfer or assignment.

      7.3.   Annulment of Defaults.  Once an Event of Default has occurred, such Event of Default shall be deemed to exist and be continuing for all purposes of this Agreement until the

62250363_5

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY      UNILOC_APPLE_2017_18307

earlier of (x) Majority Purchasers shall have waived such Event of Default in writing, (y) the Company shall have cured such Event of Default to the Majority Purchasers' reasonable satisfaction or the Company or such Event of Default otherwise ceases to exist, or (z) the Collateral Agent and the Purchasers or Majority Purchasers (as required by Section 9.4.1) have entered into an amendment to this Agreement which by its express terms cures such Event of Default, at which time such Event of Default shall no longer be deemed to exist or to have continued. No such action by the parties hereto shall prevent the occurrence of, or effect a waiver with respect to, any subsequent Event of Default or impair any rights of the parties hereto upon the occurrence thereof.

7.4.    Waivers.  To the extent that such waiver is not prohibited by the provisions of applicable law that cannot be waived, the Company waives:

7.4.1.    all presentments, demands for performance, notices of nonperformance (except to the extent required by this Agreement), protests, notices of protest and notices of dishonor;

7.4.2.    any requirement of diligence or promptness on the part of the Purchasers in the enforcement of its rights under this Agreement;

7.4.3.    any and all notices of every kind and description which may be required to be given by any statute or rule of law; and

7.4.4.    any defense (other than indefeasible payment in full) which it may now or hereafter have with respect to its liability under this Agreement or with respect to the Obligations.

## ARTICLE VIII
## COLLATERAL AGENT

8.1.    Appointment of Collateral Agent.  Each of the Purchasers hereby appoints Fortress Credit Co LLC as Collateral Agent to act for them as collateral agent, to hold any pledged collateral and any other collateral perfected by perfection or control for the benefit of the Purchasers; *provided* that the rights of the Purchasers to direct the Collateral Agent and to receive proceeds of Collateral shall be prior to, and controlling of, any rights of the Purchasers. Notwithstanding, but without limiting the foregoing, the Collateral Agent shall take direction from the Majority Purchasers and shall distribute any proceeds of the Collateral in accordance with Section 2.4, such that any proceeds of Term A/B Priority Collateral shall first be applied to satisfy the Obligations owing to the Term A/B Purchaser, as provided under Section 2.4.1, and the proceeds of Term C Priority Collateral shall first be applied to satisfy the Obligations owing to the Term C Purchaser as provided under Section 2.4.2, in each case, prior to being applied to the Obligations owing to the other Purchaser.

8.2.    Collateral.  The Collateral Agent shall act at the instruction of the Majority Purchasers with respect to providing any vote, consent or taking other action with respect to the Collateral.

62250363_5

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY          UNILOC_APPLE_2017_18308

## APPENDIX I

## DEFINITIONS

"Actual Monetization Revenues" means amounts that the Issuer or Uniloc Lux actually receives or is actually entitled to receive, or receives, in cash or an amount equal to the fair market value of any in-kind payment, from third parties in respect of the Patents, whether on account of any sale of products or services using the Patents, the development to order of any software or other products using the Patents or on account of the purchase price or in connection with the sale of hardware or software with respect to the Patents, including royalty payments, license fees, settlement payments, judgments or other similar payments in respect of the Patents, in each case as and when actually received by Uniloc Lux or the Issuer (including any and all such amounts actually received by any attorneys, agents or other representatives of either such Company). Actual Monetization Revenues shall be calculated prior to giving effect to any expenses incurred by the Company in the collection of any Actual Monetization Revenues, including, without limitation, prior to giving effect to any contingent or other fees owed to any attorneys, consultants or other professionals in the monetization of any of the Company's rights with respect to any Patents, and prior to giving effect to amounts owing between Uniloc Lux and the Issuer.

"Affiliate" means with respect to any specified Person, any other Person directly or indirectly controlling, controlled by or under direct or indirect common control with such Person, and shall include (a) any officer or director or general partner of such specified Person, (b) any other Person of which such specified Person or any Affiliate (as defined in clause (a) above) of such specified Person shall, directly or indirectly, beneficially own either (i) at least 10% of the outstanding equity securities having the general power to vote or (ii) at least 10% of all equity interests, (c) any other Person directly or indirectly controlling such specified Person through a management agreement, voting agreement or other contract and (d) with respect to any individual, such individual's child, stepchild, grandchild or more remote descendant, parent, stepparent, grandparent, spouse, former spouse, qualified domestic partner, sibling, mother-in-law, father-in-law, son-in-law and daughter-in-law (including adoptive relationships) and any trust, partnership or other bona fide estate-planning vehicle the only beneficiaries of which are any of the foregoing individuals or any private foundation or fund that is controlled by any of the foregoing individuals or any donor-advised fund of which any such individual is the donor; *provided* that neither the Collateral Agent or any Purchaser (or any Affiliate thereof) shall be deemed an Affiliate of the Company on account of the amounts owed to it under the Agreement or the relationship created thereby.

"Authorized Officer" means, with respect to any Person, the chief executive officer, chief restructuring officer, chief financial officer, president, treasurer, comptroller or executive vice president of such Person.

"Bankruptcy Code" means Title 11 of the United States Code.

"Bankruptcy Default" means an Event of Default referred to in Section 7.1.8.

"Bridge Notes" means the existing Indebtedness disclosed on Schedule 6.7.

A- 1

62250363_5

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY                    UNILOC_APPLE_2017_18320

accordance with past practice and undertaken by such Person in good faith and not for purposes of evading any covenant or restriction in any Document.

"Organization Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Patent License Agreement" means the Patent License Agreement attached hereto as Exhibit E.

"Patent Security Agreement" means the Patent Security Agreement substantially in the form of Exhibit F hereto.

"Patents" means all intellectual property of the Company, including the letters Patent set forth on Schedule I(a) and Schedule I(b), whether registered in the United States or any other jurisdiction, all registrations and recordings thereof, including all re-examination certificates and all utility models, including registrations, recordings and pending applications, and all reissues, continuations, divisions, continuations-in-part, renewals, improvements or extensions thereof, and the inventions disclosed or claimed therein.

"Person" means any entity, whether of natural or legal constitution, including any present or future individual, corporation, partnership, joint venture, limited liability company, unlimited liability company, trust, estate, unincorporated organization, government or any agency or political subdivision thereof.

"Property" means, as to any Person, all types of real, personal, tangible, intangible or mixed property owned by such Person whether or not included in the most recent balance sheet of such Person and its Subsidiaries under GAAP.

"Proxy" means that certain Proxy, dated as of the date hereof, by and between Uniloc Corporation PTY Limited, Uniloc USA, Inc., and Fortress Credit Co LLC.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Capital Stock of a Company or a Subsidiary of such Company, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Capital Stock, or on account of any return of capital to such Company's or such Subsidiary's stockholders, partners or members (or the equivalent Person thereof).

62250363_5

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY                    UNILOC_APPLE_2017_18326

## SCHEDULE 4.5(a)

## EXISTING LICENSES

## (Updated May 10, 2017)

31. License and Services Agreement dated effective as of January 1, 2013, by and between Uniloc USA, Inc. and Uniloc Luxembourg S.A. and the same such agreement dated effective September 19, 2014; February 22, 2016; and February 21, 2017; and Amendment to License and Services Agreement dated February 26, 2015.

32. Patent License Agreement dated as of December 23, 2013, between Uniloc Luxembourg S.A. and Device Authority, Inc. and subsequent First Amendment to Patent License Agreement dated August 5, 2014.

33. Patent License Agreement effective December 30, 2014, by Uniloc Luxembourg S.A. and Uniloc USA, Inc. and between Fortress Credit Co LLC.

34. Technology License and Ownership Allocation Agreement dated as of November 19, 2016 between Uniloc Luxembourg S.A. and NewCo for the use of the Centurion Platform for Agreed Limited Purposes.

35. See attached listing of licenses and license agreements.

SUMMARY OF UNILOC LICENSE AGREEMENTS
Updated May 10, 2017

| Licensee | Date | Lump Sum | | Document Type |
|---|---|---|---|---|
| 2X Software, LLC | 12/31/10 | $ | 25,000 | Settlement and License Agreement |
| | | $ | | Settlement and License Agreement |
| ABBYY USA Software House, Inc. | 08/01/10 | $ | 155,500 | Settlement and License Agreement |
| Activision Blizzard, Inc | 12/29/14 | $ | 3,500,000 | Settlement and License Agreement |
| Adobe Systems, Inc. | 10/05/11 | $ | 300,000 | Settlement and License Agreement |
| | | $ | | Settlement and License Agreement |
| Algorithmic Implementations, Inc. d/b/a Ai | 09/15/10 | $ | 66,000 | Settlement and License Agreement |
| Alien Skin Software LLC | 08/18/10 | $ | 75,000 | Settlement and License Agreement |
| Allscripts Healthcare Solutions Inc | 03/03/16 | $ | | Settlement and License Agreement |
| | | $ | | Settlement and License Agreement |
| ApexSQL, LLC | 09/15/11 | $ | 30,000 | Settlement and License Agreement |
| Argus Software, Inc. | 09/15/10 | $ | 175,000 | Settlement and License Agreement |
| Articulate Global, Inc. | 08/09/11 | $ | 95,000 | Settlement and License Agreement |
| Aspyr Media, Inc. | 12/06/13 | $ | 150,000 | Settlement and License Agreement |
| Automatic Duck, Inc. | 07/25/11 | $ | 30,500 | Settlement and License Agreement |
| Avast Holding B.V. | 07/06/16 | $ | 120,000 | Settlement and License Agreement |
| AVG Technologies USA Inc | 03/06/17 | $ | 10,000 | Settlement and License Agreement |
| Avid Technology, Inc. | 09/30/11 | $ | | Settlement and License Agreement |

62250363_5

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY           UNILOC_APPLE_2017_18337

| | | | |
|---|---|---|---|
| BCL Technologies | 09/01/10 | $ 30,000 | Settlement and License Agreement |
| BinaryNow, Inc. | 04/23/10 | $ 2,500 | Settlement and License Agreement |
| Bluebeam Software, Inc. | 05/04/10 | $ 120,000 | Settlement and License Agreement |
| BMC Software, Inc. | 09/30/11 | $ 300,000 | Settlement and License Agreement |
| Borland Software Corp. and Micro Focus | 10/31/11 | $ 395,000 | Settlement and License Agreement |
| Brooks Internet Software, Inc. | 07/06/10 | $ 55,000 | Settlement and License Agreement |
| Bvnari  Inc. | 04/23/10 | $ 15,000 | Settlement Agreement |
| CA, Inc. | 08/09/11 | $ 800,000 | Patent License and Settlement Agreement |
| Cakewalk, Inc. | 04/21/11 | $ 225,000 | Confidential Settlement and License Agreement |
| | | $ | Confidential Settlement and License Agreement |
| Carbonite Inc. | 10/05/16 | $ 200,000 | Settlement and License Agreement |
| Cerner Health Services Inc | 05/24/16 | $ | Settlement and License Agreement |
| | | $ | Settlement and License Agreement |
| CimQuest INGEAR LLC | 01/25/11 | $ 20,000 | Settlement and License Agreement |
| CIOview Corp. | 02/05/10 | $ 12,500 | Settlement agreement |
| Code42 Software, Inc. | 11/11/16 | $ 99,000 | Settlement and License Agreement |
| CommonTime, Inc. | 03/31/10 | $ 10,000 | Settlement and License Agreement |
| ComponentOne | 08/09/11 | $ 70,000 | Settlement and License Agreement |
| Compugroup Medical Inc | 08/15/16 | $ 150,000 | Settlement and License Agreement |
| Computer Programs and Systems Inc | 02/29/16 | $ 195,000 | Settlement and License Agreement |
| Corbis Holdings Inc | 11/24/14 | $ 425,000 | Settlement and License Agreement |
| Cyberlink.com  Corp | 09/02/10 | $ 150,000 | Settlement and License Agreement |
| | | $ | Settlement and License Agreement |
| Digital River, Inc. | 04/09/14 | $ 261,000 | Settlement and Release Agreement |
| Disk Doctor Labs, Inc. | 11/08/10 | $ 16,000 | Settlement and License Agreement |
| eClinicalWorks LLC | 05/09/16 | $ 300,000 | Settlement and License Agreement |
| eEye, Inc. d/b/a eEye Digital Security | 08/05/11 | $ 125,000 | Settlement and License Agreement |
| Electronic Arts Inc | 12/31/15 | $ 2,685,411 | Settlement and License Agreement |
| | | $ | Settlement and License Agreement |
| E-MDS Inc | 02/11/16 | $ 210,000 | Settlement and License Agreement |
| Endo International PLC | 03/22/16 | $ 115,000 | Settlement and License Agreement |
| Engrasp, Inc. | 02/21/11 | $ 5,000 | Settlement and License Agreement |
| Envato PTY Ltd | 12/15/14 | $ | Settlement and License Agreement |
| Fotolia LLC | 12/15/14 | $ 150,000 | Settlement and License Agreement |
| Foxit Corp. | 07/30/11 | $ 50,000 | Settlement and License Agreement |
| G7 Svstems | 09/23/10 | $ 25,000 | Email |
| GE Healthcare | 11/10/16 | $ 300,000 | Settlement and License Agreement |
| GEAR Software, Inc. and GEAR Software | 05/08/13 | $ 21,500 | Settlement and License Agreement |
| General Electric Company | 12/04/15 | $ 350,000 | Settlement and License Agreement |
| GeoSpatial | 05/27/11 | $ 20,000 | Email |
| | | $ | Settlement and License Agreement |
| GFI USA Inc. d/b/a/ GFI Software USA | 09/15/10 | $ 350,000 | Settlement and License Agreement |
| | | $ | Settlement and License Agreement |
| Greenway Medical Technologies Inc | 08/28/15 | $ 1,200,000 | Settlement and License Agreement |
| | | $ | Settlement and License Agreement |
| HumanConcepts  LLC | 06/30/10 | $ 62,500 | Settlement and License Agreement |
| Informatics Holdings, Inc. | 08/30/10 | $ 130,000 | Settlement and License Agreement |

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

| | | | | |
|---|---|---|---|---|
| Intego Inc. | 08/12/11 | $ | 50,000 | Settlement agreement |
| InternetSafetv .com, Inc. | 03/19/10 | $ | 70,000 | Settlement agreement |
| ██████ | | $ | ██████ | Settlement and License Agreement |
| Keil Software Inc. and ARM Germany | 10/01/10 | $ | 150,000 | Settlement and License Agreement |
| ██████ | | $ | ██████ | Settlement and License Agreement |
| Konica Minolta Healthcare Americas Inc | 12/15/16 | $ | 150,000 | Settlement and License Agreement |
| Krush Technologies LLC | 03/25/17 | $ | 100,000 | Settlement and License Agreement |
| LegalPro Systems, Inc. | 07/17/11 | $ | 55,500 | Settlement and License Agreement |
| Line Corporation | 04/11/17 | $ | 395,000 | Settlement and License Agreement |
| MacKichan Software Inc. | 08/18/10 | $ | 60,000 | Settlement and License agreement |
| Magix Computer Products International | 06/24/11 | $ | 90,000 | Settlement and License agreement |
| MakeMusic,  Inc. | 04/27/11 | $ | 225,000 | Settlement and License agreement |
| Maketech Systems, Inc. d/b/a Docudesk | 01/27/10 | $ | - | Settlement Agreement |
| ██████ | | $ | ██████ | Settlement and License Agreement |
| Marware Inc. | 06/23/10 | $ | 20,000 | Settlement and License Agreement |
| ██████ | | $ | ██████ | Settlement and License Agreement |
| ██████ | | $ | ██████ | Settlement and License Agreement |
| Medical Information Technology Inc | 01/27/17 | $ | 192,500 | Settlement and License Agreement |
| Microsoft Corporation | 06/30/15 | $ | ██████ | Settlement and License Agreement |
| Microsoft Corporation | 03/04/12 | $ | ██████ | Settlement and License Agreement |
| Microsoft Corporation and Mojang AB | 08/07/15 | $ | 60,000 | Settlement and License Agreement |
| National Instruments Corporation | 09/30/11 | $ | 300,000 | Settlement and License Agreement |
| NEC Corporation of America | 03/10/17 | $ | ██████ | Settlement and License Agreement |
| ██████ | | $ | ██████ | Settlement and License Agreement |
| Perfect World Entertainment Inc | 12/14/16 | $ | 52,500 | Settlement and License Agreement |
| Perkin Elmer Inc | 02/19/16 | $ | 400,000 | Settlement and License Agreement |
| PhotoShelter Inc | 07/15/15 | $ | 25,000 | Settlement and License Agreement |
| ██████ | | $ | ██████ | Settlement and License Agreement |
| Salesforce.com Inc | 12/29/16 | $ | 4,000,000 | Settlement and License Agreement |
| Shoretel Inc | 03/30/17 | $ | 850,000 | Settlement and License Agreement |
| ██████ | | $ | ██████ | Settlement and License Agreement |
| Symantec Corporation | 11/18/16 | $ | ██████ | Settlement and License Agreement |
| Tangome Inc | 12/27/16 | $ | 120,000 | Settlement and License Agreement |
| ██████ | | $ | ██████ | Settlement and License Agreement |
| TLM Inc | 01/13/17 | $ | 37,000 | Settlement and License Agreement |
| Unify Inc | 04/11/17 | $ | 225,000 | Settlement and License Agreement |
| Valve Corporation | 12/20/16 | $ | ██████ | Settlement and License Agreement |
| VectorStock Media Ltd | 07/15/15 | $ | 25,000 | Settlement and License Agreement |
| Viber Media S.a.r.l. | 12/31/16 | $ | 375,000 | Settlement and License Agreement |
| Vonage America Inc | 11/11/16 | $ | 50,000 | Settlement and License Agreement |
| Voxer Inc. | 12/19/16 | $ | 55,000 | Settlement and License Agreement |
| ██████ | | $ | ██████ | Settlement and License Agreement |
| Zoom Video Communications Inc | 11/18/16 | $ | 50,000 | Settlement and License Agreement |

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY                    UNILOC_APPLE_2017_18339