# EXHIBIT 14

# EXHIBIT A
## (DOCUMENT SOUGHT TO BE SEALED)

Page 1

1              UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                   SAN JOSE DIVISION

4    ---------------------------------------------x

5    UNILOC USA, INC.,

     UNILOC LUXEMBOURG S.A.

6    and UNILOC 2017 LLC,

7                 Plaintiff,

8    vs.                     Case No.

                             5:19-cv-01692-EJD (VKD)

9

     APPLE INC.,

10

11                Defendant.

12   ---------------------------------------------x

13          *** ADDITIONAL CAPTION ON PAGE 2 ***

14

15

16   REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF

17                    JAMES PALMER

18                  September 9, 2020

19

20   PAGES 74-237 ARE HIGHLY CONFIDENTIAL -

21   ATTORNEYS' EYES ONLY AND ARE BOUND SEPARATELY

22

23

24   Reported By: Lynne Ledanois, CSR 6811

25   Job No. 4226269

Page 2

```
 1              UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                 SAN FRANCISCO DIVISION
 4    ---------------------------------------------x
 5    UNILOC 2017 LLC,
 6              Plaintiff,
 7    vs.                      Case No.
                               3:19-cv-1095-JD
 8
      APPLE INC.,
 9
10              Defendant.
11    ---------------------------------------------x
12
13           Remote videotaped deposition of JAMES
14      PALMER, taken in San Francisco, California,
15      commencing at 10:13 a.m., on Wednesday,
16      September 9, 2020 before Lynne Ledanois,
17      Certified Shorthand Reporter No. 6811
18
19
20
21
22
23
24
25
```

Page 116

```
 1        break.  However you want to do it.
 2              MR. WINNARD:  I can't promise that
 3        we'll be done in an hour.
 4              THE WITNESS:  Okay.
 5              MR. WINNARD:  We can take a break,
 6        come back on and then take a break so you
 7        can move the car.
 8              THE WITNESS:  At 1:40 I'll have to
 9        take a break to move the car.
10              VIDEOGRAPHER:  Going off the record at
11        12:45 p.m.
12              (Recess taken.)
13              VIDEOGRAPHER:  We're back on the
14        record at 12:55 p.m.
15     BY MR. WINNARD:
16        Q    Welcome back, Mr. Palmer.
17              During the break did you discuss the
18     deposition with your counsel?
19        A    I did not.
20        Q    I'm staying on Exhibit 1, which is the
21     Uniloc Term C loan investment memorandum and I
22     would like to direct your attention to
23     Exhibit 2.  It's at Page 13.
24        A    Okay.
25        Q    What is shown on Exhibit 2 of --
```

Page 117

1    entitled "Uniloc Settlement Revenue Detail" of
2    Exhibit 1 to your deposition?
3         A    I'm sorry, are you asking me what's
4    shown there?
5         Q    Yes.
6         A    Let's see.
7              MR. FOSTER:  What page are we on of
8         Exhibit 2?
9              MR. WINNARD:  This is Page 13 of the
10        document, it ends in --
11             THE WITNESS:  Exhibit 1; right?
12   BY MR. WINNARD:
13        Q    We're in Exhibit 1 for the deposition.
14   It's Page 13 of the memorandum and it's bearing
15   Bates 1089.
16        A    Page 13 of Exhibit 1, yes.  The
17   question is?
18        Q    I'll repeat the question.
19             What is shown on Page 13 of the
20   investment memorandum entitled "Uniloc
21   Settlement Revenue Detail"?
22        A    This -- it looks to me to be a list of
23   all of the settlements that Uniloc had probably
24   since we were -- from February to April --
25   February of 2015 to April of 2017.

Page 118

1        Q     Is the table of licenses and revenue
2    shown on Page 13 of Exhibit 1 a full and
3    accurate description of all of the monetization
4    revenue that Uniloc received between February
5    2015 and April 2017?
6        A     I believe so.
7        Q     Do you have any reason to believe that
8    the listing shown on Page 13 of Exhibit 1 is
9    inaccurate or incomplete in any way?
10       A     No.
11       Q     If we look on the right-hand side of
12   the table, it shows revenue from May 31st, 2016
13   to April 14th, 2017.
14             Do you see that?
15       A     I'm sorry, say that again, please.
16       Q     Sure.  So if we look on the right-hand
17   side, we have the date of May 31st, 2016 running
18   to April 14th, 2017.
19             Do you see that?
20       A     Yes.
21       Q     And the total for that time frame of
22   Uniloc's monetization revenue was a little over
23   $14 million; right?
24       A     That looks correct.
25       Q     To the best of your knowledge, that's

Page 119

1     an accurate calculation of Uniloc's revenues

2     between May 31st, 2016 and April 14th, 2017?

3          A     That's correct.

4          Q     If we go to the left-hand side

5     briefly.  We see at the bottom there are three

6     settlements dated after March 31 of 2017.

7                Do you see those?

8          A     Three settlements dated after what?

9          Q     After March 31st, 2016, there are

10    three licensed settlement values listed --

11         A     Yes.

12         Q     -- after that date; correct?

13         A     Yes.

14         Q     Those settlements are one to Perkin

15    Elmer, one to ████████████and one to Endo;

16    correct?

17         A     Yes.

18         Q     And the total amount of those

19    settlements is a little over a million dollars;

20    right?

21         A     Yes.

22         Q     So if we include that revenue in the

23    list shown at the right, it would be fair to say

24    from April 1st, 2016 to April 14th, 2017, Uniloc

25    generated a little over $15 million in revenue;

Page 120

1    is that right?

2         A     I would categorize it as they

3    generated $15 million in settlements.

4         Q     Is there any other revenue that Uniloc

5    generated between February 2015 and April 2017

6    other than this?

7         A     I don't believe so, but I'm just not

8    sure.

9         Q     So let me ask that again because I

10   think we got crosstalk there.

11              Aside from the settlement values

12   listed on Page 13 of the investment memorandum,

13   did Uniloc generate any other revenue between

14   February 2015 and April 2017 that's not

15   reflected on this page?

16        A     I don't have the financials from that

17   time frame, so I cannot say yes or -- I cannot

18   say yes to that.

19        Q     Can you think of any revenue that's

20   missing between February 2015 and April 2017

21   other than --

22        A     Not off the top of my head.

23        Q     Sitting here today, you're not able to

24   identify any other revenue that Uniloc generated

25   between February 2015 and April 2017; right?

Page 121

1       A      That's correct.

2       Q      If we look at the numbers shown on

3   Page 13 of the Fortress investment memorandum,

4   would you agree that for the time period between

5   April 1st, 2016, the March 31st, 2017, Uniloc

6   generated less than $20 million in monetization

7   revenue?

8       A      That's correct, I would think, based

9   on this.

10      Q      Do you have any reason to believe that

11  Uniloc generated more than $20 million in

12  monetization revenue between April 1st, 2016 and

13  March 31st, 2017?

14      A      No.

15      Q      Sorry, let me go through that again.

16  I know you know where I'm going, but I just want

17  to make sure it's clear for the record.

18             Do you have any reason to believe that

19  Uniloc generated more than $20 million in

20  monetization revenue between April 1st, 2016 and

21  March 31st, 2017?

22      A      No.

23      Q      It would be correct to say that Uniloc

24  generated less than 20 million in monetization

25  revenues for the period of time from April 1st,

Page 122

1     2016 to March 31st, 2017; right?

2         A     Based on this, yes.

3         Q     Do you have any other knowledge other

4     than what's shown on Page 13 as to whether

5     Uniloc generated more or less than $20 million

6     in this time frame?

7         A     Not off the top of my head.

8         Q     If you could move back up in Exhibit 1

9     to Page 4, which ends in Bates 1080.

10        A     Page 4?

11        Q     Yes.  The title of this says

12    "Intellectual Property Update."

13              Do you see that?

14        A     Yes.

15        Q     And to be clear, I don't want you to

16    tell me the context of what's blocked out here.

17    I don't want any subject matter.

18              But can you answer for me yes or no

19    whether the information contained on Page 4

20    would be due diligence or valuation work

21    performed by Fortress's IP team?

22        A     I cannot.

23        Q     You don't know one way or the other

24    whether that's what is contained on Page 4?

25        A     I do not know what's contained in

```
                                         Page 123
 1      Page 4.
 2         Q     Okay.  We can set aside Exhibit 1.  I
 3      guess just electronics, so we can leave it.
 4             MR. WINNARD:  I'm going to find a
 5         document that will be Exhibit 3.  Just a
 6         moment.
 7             Okay.  I'm marking and introducing as
 8         Exhibit 3, a document entitled "Third
 9         Amendment to Revenue Sharing and Note and
10         Warrant Purchase Agreement."  And it ends --
11         it begins with production number
12         UNILOC_APPLE_2017-18265.
13             (Exhibit 3 was marked.)
14      BY MR. WINNARD:
15         Q     Do you now see Exhibit 3 in your
16      folder?
17         A     Yes.
18         Q     And, Mr. Palmer, this is Exhibit 3,
19      which is the third amendment to the revenue
20      sharing and note and warrant purchase agreement;
21      right?
22         A     Let's see.  Yes.
23         Q     And I'll note for you -- I think it's
24      starting on the Page 14 of the document.  It's
25      production Number 18278.  It starts with the
```

Page 124

1    conformed copy of the revenue sharing and note
2    and warrant purchase agreement which was
3    attached to the amendment.
4            Do you see that?
5    A    What page?
6    Q    It would be Page 14 of the electronic
7    copy or maybe it's Page 13, ending in the
8    production number over in the bottom right of
9    18278.
10   A    Yes.
11   Q    You can take a moment to flip through
12   it.  I'll represent to you that this is the
13   third amendment to the revenue sharing agreement
14   between Uniloc and Fortress and it attaches the
15   conformed version of that agreement after the
16   third amendment is executed.
17           (Discussion off the record.)
18           MR. FOSTER:  What is the production
19       number on the page you want to call his
20       attention to.
21           MR. WINNARD:  For now I was just
22       showing him it's essential this was produced
23       as one combined document.  It's the
24       amendment to the revenue sharing agreement
25       and then the full version with the amendment

1       A     I don't recall if we did or did not.

2   I would have to go through the documents.

3       Q     Sitting here today, you cannot recall

4   if Fortress removed Section 6.2.2 from the

5   revenue sharing agreement; right?

6       A     I believe I made my -- I've answered

7   that question previously.

8       Q     Please answer.  Sitting here today,

9   you cannot recall whether Fortress removed

10  Section 6.2.2 from the revenue sharing

11  agreement; right?

12      A     Simply because I don't have the

13  documents in front of me from that perspective.

14  But from a management perspective of this, for

15  sure we did not -- we had no concern about the

16  actual monetization revenues in 6.2.2.

17      Q     Did you or anyone else at Fortress

18  ever communicate to Uniloc in writing that

19  Fortress would never enforce Section 6.2.2 of

20  the revenue sharing agreement?

21      A     I don't recall if we did.

22      Q     Sitting here today, you can't identify

23  any writing where Fortress did so; right?

24      A     I cannot other than I think, again --

25  this is because I don't have all of the

1    documents in front of me, I believe -- I have to

2    look at the last amendment and I don't know if

3    we would have gone through a last amendment if

4    we thought that they were in default, so I

5    mean -- or provided the additional capital if we

6    thought they were in default.  In fact, I know

7    we wouldn't have.

8              MR. WINNARD:  I'm going to mark as

9         Exhibit 4 when we get it open here.  Not

10        marked yet.  Just give me a minute.

11             Marking as Exhibit 4 document starting

12        with production number Apple 358 -- or

13        UNILOC_APPLE_358_0352.

14             (Exhibit 4 was marked.)

15   BY MR. WINNARD:

16        Q    Mr. Palmer, do you see Exhibit 4?

17        A    Yes, it just came up.

18        Q    Okay.

19        A    I'm laughing because it's a big one.

20   That's all.

21        Q    It's 62 pages on this.  I want to make

22   sure you have the same --

23        A    Oh.

24             MR. FOSTER:  From a data size

25        standpoint.

Page 161

1            THE WITNESS:  Got it.

2            MR. FOSTER:  36 megabytes.

3    BY MR. WINNARD:

4        Q    Do you see that Exhibit 4 in the

5    middle is entitled "Revenue Sharing and Note and

6    Warrant Purchase Agreement"?

7            Do you see that?

8        A    Yes.

9        Q    And in the top right you see "RG draft

10   of 12/18/2014"; right?

11       A    12/18/2014, got it.

12       Q    The draft says RG draft; right?

13       A    Yes.

14       Q    Do you have an understanding that RG

15   would have stood for Ropes & Gray, Fortress's

16   counsel?

17       A    Yes.

18       Q    Do you understand this to be a draft

19   prepared by Fortress's counsel of the revenue

20   sharing agreement?

21       A    That's what it looks like.

22       Q    Do you have any reason to believe that

23   it's not a draft prepared by Fortress's counsel?

24       A    I do not.

25       Q    I'll take you to page -- I believe

```
                                            Page 162
 1    it's 14 of the document.
 2         A     What is the -- what do you call it?
 3         Q     The Bates or production number at the
 4    bottom is 0369.
 5         A     Okay.
 6         Q     It's taking a minute to load.
 7         A     Yes.
 8         Q     We're looking at -- do you see
 9    Section 6.2?
10         A     Yes.
11         Q     And you see in this draft Fortress's
12    counsel has revised Section 6.2; right?
13         A     There's red and there's blue.  I'm not
14    sure who did what.  Red, blue and black,
15    obviously, so I'm not sure who's blue and who's
16    red.
17         Q     Do you have an understanding of how an
18    agreement is modified or redlined?
19         A     Yes.
20         Q     Do you understand that generally text
21    that's been removed is shown in red and struck
22    through?
23         A     No, I understand.  I just didn't know
24    who removed and who added is what I was saying.
25         Q     You understand this is a draft
```

1    prepared by Fortress's counsel; right?

2         A     Yes.  But somebody marked it up.

3         Q     Right.  You understand this is Ropes &

4    Gray's draft of December 18th, 2014; right?

5         A     Yes.

6         Q     If we look at Section 6.2 and we go to

7    Section 6.2.1.

8               Do you see that?

9         A     Yes.

10        Q     The original language stated that

11   Uniloc would need to seek to satisfy the

12   monetization milestones; right?

13        A     That's what it looks like.

14        Q     And that language is removed in the

15   draft of Fortress' counsel of December 18th,

16   2014 in Exhibit 4; right?

17        A     Yes.

18        Q     So the prior draft required Uniloc

19   only to seek to satisfy the milestones; right?

20        A     Before -- I'm not sure I understand

21   the question.  So somebody struck out that

22   language, I see that.

23        Q     So prior to that language being

24   struck, the agreement only required Uniloc to

25   seek to satisfy the milestones; right?

Page 165

1    sharing agreement; right?

2         A     That's correct.

3         Q     To the best of your knowledge, who at

4    Fortress who would have been the one to

5    authorize this modification to Section 6.2?

6         A     Maybe our attorneys.  I don't recall.

7         Q     To the best of your knowledge, who at

8    Fortress would have been telling the attorneys

9    whether or not they can make this change?

10        A     I think probably Yoni would have been

11   involved in the documentation of this.

12        Q     Aside from Yoni, is there anyone else

13   at Fortress who you believe may have information

14   about the changes that Fortress had made to

15   Section 6.2 of the revenue sharing agreement?

16        A     I don't recall.

17        Q     Have you searched your --

18        A     Hold on one second.  Jim is having

19   trouble getting that right section up.

20              (Discussion off the record.)

21              THE WITNESS:  Sometimes it's hard

22        unless you do it straight over.

23              Sorry about that.  Go ahead.

24   BY MR. WINNARD:

25        Q     Have you searched your email for any

Page 166

```
 1    discussions regarding Uniloc monetization
 2    minimum requirements from 2014 to the present?
 3        A     I don't recall recently, but I
 4    probably did at some point.
 5        Q     Did you search in the last three
 6    months for emails regarding Uniloc's minimum
 7    revenue target?
 8        A     Probably not.
 9        Q     You can't think sitting here today
10    that you did so; is that right?
11        A     I don't recall doing so.  Go ahead.
12        Q     In the December 18th, 2014 draft
13    prepared by Fortress's counsel, Section 6.2.2
14    was added to the agreement; right?
15        A     Yes.
16        Q     Why did Fortress add this requirement
17    to the revenue sharing agreement?
18        A     I don't recall.
19        Q     Do you have any knowledge as to why
20    this revenue requirement was added to the
21    revenue sharing agreement by Fortress?
22        A     I do not.
23        Q     Who at Fortress would know why this
24    revenue requirement was added to the revenue
25    sharing agreement?
```

1        A     You know, I think it was myself and
2    Yoni working on this.  I just don't recall any
3    discussions about this.
4        Q     In the original draft or prior draft
5    of this agreement, Uniloc needed only to seek to
6    satisfy the monetization milestones in
7    Section 6.2.1; right?
8              MR. FOSTER:  Object to the form.
9              THE WITNESS:  That's what it looks
10        like.
11   BY MR. WINNARD:
12        Q     Section 6.2.2 requires Uniloc to
13    actually hit certain minimums; right?
14              MR. FOSTER:  Object to the form.
15              THE WITNESS:  It has inserted 6.2.2.,
16        correct.
17   BY MR. WINNARD:
18        Q     Your understanding of Section 6.2.2 is
19    that it would require Uniloc to generate
20    specific amounts of revenue in specific amounts
21    of time; right?
22        A     Let me read it.
23              That's what it states here.
24        Q     Do you have any understanding as to
25    why this specific revenue requirement was added

Page 168

1    to the revenue sharing agreement?

2         A     I don't.  I can only surmise just to

3    bring us into the conversation and give us a

4    general guideline of what we were expecting.

5         Q     Do you know why this revenue

6    requirement was placed in Article VI of the

7    revenue sharing agreement as opposed to any

8    other article or portion of the agreement?

9         A     I couldn't comment on that.

10        Q     Is it your understanding that a breach

11   of any of the covenants in Article VI would

12   constitute an event of default under the

13   revenue --

14        A     No.

15        Q     -- stream agreement?

16        A     No.

17        Q     What is the basis for that belief?

18        A     You know, in my mind it's just a

19   guideline to bring us into the conversation.

20        Q     Is there any portion of the revenue

21   sharing agreement on which you're relying for

22   your testimony that a breach of any of the

23   covenants in Article VI is not an event of

24   default?

25        A     I've not read through it in detail

1    recently.  That statement is correct.

2         Q    You're relying on something other than

3    the agreement itself for your belief that a

4    breach of the covenants in Article VI would not

5    constitute an event of default; is that right?

6         A    Are we talking at this particular time

7    in 2014?

8         Q    At any time.

9         A    As I stated before, we would have

10   ongoing discussions about the performance and at

11   no time did I consider this investment in a

12   default situation.

13        Q    Right.  My question is a little bit

14   different.

15             To be clear, you're not relying on the

16   language of the agreement itself for your belief

17   that a breach of the covenants in Article VI

18   would not be an event of default; right?

19        A    Well, again, this comes down to an

20   issue of timing.  I don't know -- I'm not

21   familiar with the documentation after this.  And

22   I don't know when the amendments would have come

23   in and I just don't know from a timing

24   perspective, so...

25        Q    Is there a provision in the agreement

```
 1      that you can point to for your belief that a
 2      breach of Article VI -- of any of the covenants
 3      in Article VI is not an event of default?
 4           A      Not specifically.  I would think that
 5      the fact that we gave them additional capital
 6      and we're happy with the investment is
 7      sufficient.
 8           Q      That's not a provision in the
 9      agreement, though; right?
10           A      I haven't looked at the agreements in
11      awhile, so I don't know.
12           Q      Right.  So to be clear --
13           A      If I recall, when we signed one of the
14      amendments or several of the amendments, it's --
15      this was never addressed, so it was never a
16      concern for us.
17           Q      Did anyone at Fortress discuss
18      amending Section 6.2.2 at any time after
19      December 2014?
20           A      I don't recall specifically discussing
21      Amendment 6.2.2.
22           Q      Did anyone at Uniloc ask Fortress to
23      amend or remove Section 6.2.2 of the revenue
24      sharing agreement at any point after December
25      2014?
```

1      A     I know that Craig and I had touched on

2    conversations about generation of revenue and

3    what we were expecting and so forth and the

4    status of the investment.  I don't know if he

5    would have brought up 6.2.2.  I don't recall if

6    he did or he didn't.  But we did certainly

7    address kind of ongoing revenue.

8      Q     So just to be clear, sitting here, you

9    don't have a recollection that he ever asked to

10   amend or remove Section 6.2.2 of the revenue

11   sharing agreement; right?

12     A     I don't recall.

13     Q     In the language of Section 6.2.2 of

14   the revenue sharing agreement draft of

15   Exhibit -- shown on Exhibit 4, Uniloc was given

16   from the closing date through December 31st,

17   2016 to receive at least $20 million in

18   monetization revenues; right?

19     A     That's what that states.

20     Q     And the closing date was around the

21   end of December 2014?

22     A     I believe that's correct.

23     Q     How did Fortress determine the time

24   period over which Uniloc would need to generate

25   $20 million starting from the closing date?

Page 172

1          A       I don't recall.

2          Q       Did you have any involvement in

3    setting the time period over which Uniloc would

4    need to generate $20 million starting from the

5    closing date?

6          A       I don't recall those conversations.

7          Q       Did Fortress have any documents to

8    justify its request that Uniloc must generate at

9    least $20 million of monetization revenues from

10   the closing date through December 31st, 2016?

11         A       Not that I am aware of.

12         Q       Did Fortress generate any documents to

13   support its ask or amendment of this section to

14   require Uniloc to generate at least $20 million

15   in monetization revenues during the four fiscal

16   quarter period ending on March 31st, 2017?

17         A       Can you ask that question again,

18   please?

19         Q       Sure.  Did Fortress generate any

20   documents to justify its request that Uniloc

21   generate at least $20 million of monetization

22   revenues over the four fiscal quarter period

23   ending March 31st, 2017?

24         A       Did we generate any documents that

25   showed that -- that showed our desire to amend,

```
                                        Page 173
 1      is that what you're asking?  One more time.  I'm
 2      sorry.
 3          Q     Let's ask it this way:  How did
 4      Fortress decide what the monetization minimum
 5      would be in Section 6.2.2?
 6          A     I don't know.
 7          Q     Who was involved --
 8          A     I don't recall those conversations.
 9          Q     Who was involved in the decision to
10      set the monetization minimum revenue at
11      $20 million in Section 6.2?
12          A     I don't recall specifics.  I'm sure
13      Yoni would have been involved in that.
14          Q     In Section 6.2.2 there's two different
15      time periods; right?  The first is from the
16      closing date through December 31, 2016; right?
17          A     Yes.
18          Q     And that's a period of about two
19      years?
20          A     Yes.
21          Q     And then the second period is a fourth
22      fiscal quarter period ending March 31st, 2017
23      and judged from the last date of each fiscal
24      quarter thereafter; right?
25          A     Yes.
```

Page 174

1          Q      And that's a period of one year;
2     right?
3          A      That's what it looks like.
4          Q      And in each time period Uniloc was
5     required to generate $20 million in revenue;
6     right?
7          A      I'm not sure that's what was intended,
8     but I was not involved.  But again, you could
9     read it like that.
10          Q      Why did Fortress shorten the time
11     period Uniloc had to generate $20 million after
12     two years had elapsed?
13          A      I don't know.
14          Q      Was it Fortress's expectation that
15     Uniloc would become more successful over time in
16     amending this provision?
17          A      I'm sorry, say that again.  What do
18     you mean amending the provision?
19          Q      Sure.  I'll cut that out.
20                 As of September 2014, was it
21     Fortress's expectation that Uniloc would
22     generate more revenue over time?
23          A      I think that you go into any
24     investment hoping that it's going to be
25     successful over time.

Page 175

1        Q      Was it Fortress's expectation that
2    Uniloc would generate more revenue two years
3    down the line as opposed to in the first year?
4        A      Maybe.   I don't recall the
5    conversations around the status of what Uniloc
6    was doing at that particular juncture.
7        Q      Do you have any understanding as to
8    the significance of this provision to Fortress
9    as of December 2014?
10       A      Can you ask the question -- what is
11   the significance of this in December '14?
12       Q      What is your understanding of the
13   significance of Section 6.2.2 in December 2014?
14       A      Just to give us general guidelines of
15   what we would expect or what to expect.
16       Q      You understand that -- let's go back
17   to Exhibit 3 for a moment if we can.
18       A      Okay.   I have it.
19       Q      Let's go to Section 6.2 in this
20   agreement.   If I can remember the page number.
21   It's taking a minute to load.
22       A      I have it here.
23       Q      It looks like it's Page 16.
24       A      What agreement is this or I'll have to
25   scroll to the top again?   This is the --

Page 181

1    have touched on this.  We may not.  But we

2    absolutely touched on revenue generation and

3    expectations.

4          Q     Right.  I'm focusing on the revenue

5    requirement minimum.

6                Is it your testimony sitting here

7    today that you can't recall the specific

8    instance where you discussed the

9    20 million-dollar revenue minimum requirement

10   with Craig Etchegoyen or anyone else at Uniloc?

11         A     That's correct.

12         Q     Can we move to Section 7.2 of the

13   agreement?  It's on Page 24 of the agreement and

14   it's production Number 1830.

15         A     Okay.

16         Q     And there's "Remedies Following an

17   Event of Default."

18                Do you see that?

19         A     Yes.

20         Q     "If any one or more events of default

21   shall occur, then in each and every such case,"

22   colon.

23                Do you see that?

24         A     Yes.

25         Q     Then it proceeds to list the number of

1    remedies that Fortress would have in the event

2    of a default; right?

3         A     That's what it looks like.

4         Q     Is it your understanding that Fortress

5    would need to take action to affirmatively

6    invoke these remedies in the event of a default?

7         A     Ask the question one more time,

8    please.

9         Q     Let's start with Section 7.2.1.  That

10   section reads, "The majority purchasers (or the

11   collateral agent, acting at the direction of the

12   majority purchasers) may proceed to protect and

13   enforce" and so on.

14              Do you see that?

15        A     Yes.

16        Q     Do you see the language that the

17   majority purchasers may proceed; right?

18        A     Yes.

19        Q     They are not required to do so by the

20   agreement?

21        A     Okay.

22        Q     Do you see that?

23        A     Yes.

24        Q     Would you agree that at least this

25   remedy is at Fortress's option; right?

Page 183

1      A     Based on -- I'm not a legal expert,

2    I'm not a lawyer, and so I can't legally --

3    legally -- I don't think I should comment on

4    that.

5      Q     Do you have an understanding

6    separately from the agreement in terms of when

7    there is an event of default, whether Fortress

8    has options at its disposal in terms of the

9    remedies it would have?

10     A     I mean, that would be -- normally I

11   think we would have to put them in default in

12   order to have those rights.  That's the way I

13   think it works on most of the stuff.

14     Q     Do you understand that Fortress would

15   need to make an election in order to invoke

16   remedies following an event of default?

17            MR. FOSTER:  So let me just stop you

18        there.  You've been asking him about 7.2.1.

19        Are you limiting your question to that or

20        are you broadening it to other sections?

21            MR. WINNARD:  I'm broadening it.

22            MR. FOSTER:  Okay.  Thank you.

23            THE WITNESS:  So please ask the

24        question again.

25   BY MR. WINNARD:

Page 184

1          Q     I'll state it this way:  Under the
2     revenue sharing agreement, do you have an
3     understanding as to whether Fortress's remedies
4     automatically come into play or whether it must
5     evoke them affirmatively in the event of a
6     default?
7          A     You know, legally how this is written,
8     I do not -- I'm not sure exactly, although based
9     on everything else that we do, I would suspect
10     that we would have to put them in default.
11          Q     Is there language in the agreement of
12     which you're aware that would require Fortress
13     to put Uniloc into default in order to invoke
14     its remedies?
15          A     Based on my review of it today, I
16     can't see it, but I would have to review the
17     entire document again.
18          Q     If you would turn to Section 7.3.
19     This is "Annulment of Defaults."
20               Do you see that?
21          A     Yes.
22          Q     Is Section 7.3 standard language in
23     Fortress's revenue sharing agreements?
24          A     I wouldn't know.
25          Q     As the managing director of IP at

1    Fortress, do you have an understanding of this
2    provision?
3         A    So that's a different question.
4    Please -- specifically you're asking me about
5    this section in this instance or what?
6         Q    Do you have an understanding of this
7    language as the managing director of IP
8    transactions at Fortress?
9         A    On this specific language in this
10   specific section?  Again, I'm not a lawyer, you
11   know, legalese here, I'm not sure, so...
12        Q    You don't profess to be an expert in
13   the meaning of Section 7.3; right?
14        A    That's what I'm saying.
15        Q    Do you know why Fortress includes
16   Section 7.3 in the agreements with patent
17   assertion entities?
18        A    I didn't say that they put this in all
19   agreements with patent assertion entities.  In
20   this particular case, I don't know why it's
21   here.
22        Q    Let me ask that question.
23             Do you know why Section 7.3 was
24   included in the revenue sharing agreement
25   between Uniloc and Fortress?

Page 186

1        A      I do not.

2        Q      Did Fortress ever waive any event of

3    default in writing under this revenue sharing

4    agreement?

5        A      I don't believe Fortress ever

6    considered this company to be in event of

7    default.  So therefore, we would not have waived

8    it, I don't think.  But we never thought they

9    were in default.

10       Q      Are you aware of any instance where

11   Fortress waived an event default in a revenue

12   sharing agreement between Fortress and --

13       A      I don't recall.

14       Q      To the best of your understanding,

15   there was never an instance where Fortress

16   waived in writing any event of default under the

17   revenue sharing agreement between Fortress and

18   Uniloc; right?

19       A      To the best of my knowledge.

20       Q      To the best of your knowledge, that's

21   correct?

22       A      Yes, although I would say the fact

23   that we gave them more money and were very happy

24   with them, I mean, I can't imagine we considered

25   them in default.

1    Q    Did Fortress ever enter any amendment
2    to the revenue sharing agreement that waived any
3    event of default?
4    A    I don't have them in front of me, so I
5    don't recall.
6    Q    Are you aware of any amendment to the
7    revenue sharing agreement that operated as a
8    waiver of any event of default?
9         MR. FOSTER:  Objection to the form.
10        THE WITNESS:  You keep asking me if we
11        waived the event of default.  I don't
12        believe we considered them in default to
13        then waive them and waive the default.
14   BY MR. WINNARD:
15   Q    So is the answer to my question that
16   there was no waiver because you believed there
17   never to be an event of default?
18   A    I'm not aware of any waiver, specific
19   waiver.
20   Q    Are you aware of any general waiver?
21   A    I believe the fact that we continued
22   to give them money and were happy with the
23   investment, you know.  I mean, I don't think
24   there was any waiver because we never thought
25   they were in default.  I don't know how many

Page 188

1      times I can say it.
2           Q     So for the same reason, was there
3      never a cure of any event of default because you
4      never believed Uniloc to trigger an event of
5      default?
6                    MR. FOSTER:  Objection to form.
7                    THE WITNESS:  Again, I would defer to
8             my previous answers.
9      BY MR. WINNARD:
10          Q     This question is slightly different.
11     I'm asking about cure.  You've testified that
12     you don't believe there had been an event of
13     default.
14                   My question is:  Given your belief
15     that you don't believe there was an event of
16     default, is it also the case you believe there
17     was never a cure of any event of default?
18                   MR. FOSTER:  Same objection.
19                   THE WITNESS:  I'll state again I don't
20            believe that there was an event of default.
21     BY MR. WINNARD:
22          Q     Can you answer my question?
23          A     Can you say it again?  I'm sorry.
24     Please go ahead.
25          Q     Given your belief that there was never

Page 189

1    an event of default, is it your testimony that

2    there was never a cure of any event of default

3    under the revenue sharing agreement?

4        A    I mean, I guess that would be the

5    case, yes.

6        Q    Is that a yes, that it's your

7    testimony that given your belief that there was

8    no event of default, you also believe there was

9    no cure of any event of default under the

10   revenue sharing agreement; correct?

11       A    I mean, it just seems like a strange

12   question that I'm not sure, you know, like the

13   answer you're fishing for on that.

14            I don't believe that there was an

15   event of default and, therefore, you know, you

16   could derive from that what you will.

17       Q    Right.  I'm asking you to help me

18   confirm my understanding.

19            So given your understanding there was

20   never an event of default, is it also your

21   understanding in your testimony today that there

22   was no cure of any event of default under the

23   revenue sharing agreement?

24            MR. FOSTER:  Same objection.

25            THE WITNESS:  If there was no default,

Page 190

1           there can be no cure.

2     BY MR. WINNARD:

3           Q     What is your understanding of the word

4     "cure" as it's used in Section 7.3 of the

5     revenue sharing agreement?

6           A     Let's see.  Down at the "Y"?

7           Q     Correct.

8           A     The company shall have cured -- I

9     guess the majority -- I'm talking to myself out

10    loud, I apologize.

11               I'm not a lawyer.  I don't want to

12    comment on what this legalese actually means.

13          Q     Do you have any understanding of the

14    word "cure" as it's used in the revenue sharing

15    agreement?

16          A     I believe that would mean satisfy.

17          Q     So in order to cure a revenue

18    shortfall of $20 million, you would need to

19    generate $20 million; right?

20               MR. FOSTER:  Objection.

21               THE WITNESS:  I don't think so.

22    BY MR. WINNARD:

23          Q     What do you mean by the word "satisfy"

24    as a definition for the word "cure"?

25          A     We could have amended the strategy,

Page 191

1  changed the strategy, decided to, you know, take

2  a different direction.  Many things could have

3  affected this.

4       Q    Just so I understand how you're

5  understanding of the word "cure," if Uniloc

6  breached the agreement but Fortress didn't care

7  about the breach and was still satisfied, would

8  you consider that a cure under the revenue

9  sharing agreement?

10      A    I'm not going to comment on that.  I'm

11  not a lawyer.

12      Q    Is your answer that you don't have any

13  information or belief as to whether that would

14  constitute a cure?

15           MR. FOSTER:  Objection.

16           THE WITNESS:  Yes.

17  BY MR. WINNARD:

18      Q    So in the circumstance where Uniloc

19  breached the agreement but Fortress was

20  satisfied nevertheless with Uniloc's

21  performance, you can't testify one way or the

22  other if that is a cure of the revenue sharing

23  agreement?

24           MR. FOSTER:  Objection.

25           THE WITNESS:  I'm sorry, say that

Page 204

1      Q     That says, "The agreement, in turn,

2   specified, under "Annulment of Defaults"

3   Paragraph 7.3, that an event of default would

4   end after Fortress (on behalf of the majority

5   purchasers), either was reasonably satisfied

6   Uniloc had affected a cure, or had waived the

7   event of default."

8            Do you see that?

9      A     Yes.

10     Q     What is your understanding of the

11  difference between a cure and waiver as you've

12  used them in Paragraph 4 of your declaration?

13     A     You know, in this instance, a waive of

14  the event of default is there was no default and

15  a cure would be if there was a default, it was

16  cured.

17     Q     Let's set aside the specifics of

18  Section 6.2 and the minimums and whether that's

19  a default.  What my question is just to make

20  sure I understand when you're using "cure" and

21  "waiver" in your declaration whether there is --

22  what your understanding of those two terms is?

23     A     So I guess -- affected a cure or

24  waived in the event of default -- if I thought

25  that there was a default, it was cured and if --

Page 205

1    or I had waived it as in there was no default.
2        Q    Sorry, let me just ask this.  What is
3    the definition of the word "cure" as you used it
4    in your declaration?
5        A    The definition would be that --
6    satisfied.
7        Q    What do you mean by "satisfied"?
8        A    As in there is no default.  Oh, it's
9    right here.
10            I'm fixing the microphone.  I
11   apologize.  Is that better?
12            Awesome.  Thanks.
13            I'm sorry, go ahead.
14       Q    So in the language of the agreement
15   there's discussions of curing an event of
16   default.  Is that right?
17       A    Yes.  What I'm saying here is that I
18   don't believe there was a default, but if
19   somebody forces me to say there is a default, it
20   was cured in my mind.
21       Q    How did Uniloc -- why don't we get to
22   that in the specifics.  Maybe that will make it
23   more clear later.
24       A    As in I could cure it by saying you
25   don't have to generate this revenue.

Page 206

1      Q     It is your understanding that Fortress
2    said, you don't have to generate this revenue.
3    Even though -- if Uniloc did nothing else, that
4    would be a cure, as you understand it and as you
5    used that word in your declaration; is that
6    right?
7                MR. FOSTER:  Objection.
8                THE WITNESS:  I believe that's what
9        I'm saying.
10   BY MR. WINNARD:
11     Q     So as used in your declaration, "cure"
12   would come in the circumstance where Fortress
13   said to Uniloc, you don't have to do anything
14   with the revenue, I'm already satisfied; is that
15   right?
16     A     I think it would be waiving -- yes, I
17   think that would be it.
18     Q     Do you have an understanding of the
19   meaning of an event of default other than how it
20   is described in the revenue sharing agreement?
21     A     Please be more specific.
22     Q     Is your understanding of an event of
23   default different or the same as it's described
24   or defined in the revenue sharing agreement
25   between Uniloc and Fortress?

Page 207

```
 1        A     I believe I understand what an event
 2    of default is.
 3        Q     Is that understanding the same or
 4    different from how it's defined in the revenue
 5    sharing agreement between Uniloc and Fortress?
 6              MR. FOSTER:  Objection.
 7              THE WITNESS:  Say that again, please.
 8  BY MR. WINNARD:
 9        Q     Is your understanding of an event of
10    default different from what -- how it's defined
11    in the revenue sharing agreement?
12              MR. FOSTER:  Same objection.
13              THE WITNESS:  I believe I understand
14        what an event of default is.
15  BY MR. WINNARD:
16        Q     Right.  I'm just asking to make sure I
17    understand your understanding.
18              Is your understanding the same or
19    different from how an event of default is
20    defined in the revenue sharing agreement?
21              MR. FOSTER:  Same objection.
22              THE WITNESS:  Is my understanding of
23        an event of default the same as it is in the
24        revenue sharing agreement?
25              Well, I think you're reading it saying
```

1          they are in default and I'm reading it

2          saying I don't believe they are in default.

3          So...

4    BY MR. WINNARD:

5          Q     Do you agree with the express terms of

6     the revenue sharing agreement defining what an

7     event of default is under the terms of that

8     agreement?

9          A     I believe that's the purpose of that

10    section to define events of default.

11         Q     Do you have any basis to disagree that

12    that is the definition of event of default for

13    purposes of the revenue sharing agreement?

14         A     No.

15         Q     Do you agree that the parties didn't

16    modify the definition of event of default at any

17    time after December 2014; right?

18         A     In writing?

19         Q     In any way.

20         A     Well, if an event of default was -- I

21    think we probably did redefine it.

22         Q     What was the new definition of event

23    of default?

24         A     I don't think we considered the

25    revenue monetization milestones events of

```
                                      Page 211

 1    default?
 2             MR. FOSTER:  Cure to Fortress's
 3         reasonable satisfaction.
 4             MR. WINNARD:  We don't need speaking
 5         objections, Jim.
 6             THE WITNESS:  Ask me the question
 7         again, please.
 8    BY MR. WINNARD:
 9         Q    How did Uniloc cure the event of
10    default that you're referencing in Paragraph 12
11    of your declaration?
12         A    Okay.  So I think what I'm trying to
13    say here is I never believed them to be in
14    default.  And if for some reason somebody says
15    they are in default, the simple fact that we
16    executed that May 15 agreement, you know, states
17    that these guys are not in default.
18         Q    Do you consider the execution of that
19    amendment to the agreement as the cure of any
20    event of default?
21         A    I would put it this way.  Okay.  I
22    don't believe they were in default and if, in
23    fact, somebody says they are in default, the
24    fact that we move forward, you know, establishes
25    the fact that we don't believe that there is a
```

Page 212

1    default at that juncture.

2         Q    What specific actions did Uniloc take

3    to cure any event of default that may have

4    existed as of March 31st, 2017?

5         A    I think they would have had to thought

6    they were in default to take action to cure a

7    default.  Since neither they nor us considered

8    them in default, I'm not sure they would have --

9    I don't know what actions you reference.

10             As I stated before, this is what I'll

11   say again.  As I said ten different times, Craig

12   and I would have ongoing conversations about

13   strategy direction, et cetera, and you

14   constantly want to have discussions and make

15   sure you're on track and you make changes here

16   and decisions here.

17             So we never considered them in default

18   because we made a decision on not to go by the

19   monetization milestone.

20        Q    Who made the decision?

21        A    Myself.  There were maybe others

22   involved in the discussion, certainly

23   discussions with Craig.  We made the decision

24   that that's not the appropriate direction and

25   we're happy with it and we'll provide additional

Page 213

1    investment.

2        Q    Are there any documents that you're

3    referring to where you commit to writing a

4    decision not to enforce the revenue minimum?

5        A    I believe that the simple fact that we

6    executed amendments and didn't put them in

7    default is, you know, evidence enough.

8        Q    Did Uniloc propose to take any actions

9    after March 31st, 2017 to cure any potential

10   events of default caused by its revenue

11   shortfall?

12       A    As I just stated, neither Uniloc nor

13   Fortress considered them in default.  So I don't

14   think they would have had to specifically

15   address taking action against that or on that.

16       Q    So Uniloc didn't propose any actions

17   to cure; right?

18            MR. FOSTER:  Objection.

19   BY MR. WINNARD:

20       Q    Because there was nothing to cure?

21       A    Correct.

22       Q    Because it's your understanding there

23   was nothing to cure, Uniloc proposed no actions

24   to cure?

25       A    Correct.

```
1              MR. FOSTER:  You have another
2         26 minutes left.  The last 20 minutes shows
3         exactly why I'm telling you to proceed at
4         your peril if you just keep repeating the
5         same questions over and over again.
6    BY MR. WINNARD:
7         Q     On what date did Uniloc cure any event
8      of default that may have been triggered by --
9         A     I'm not going to answer that.
10        Q     You can't identify a date for me?
11        A     I think you're asking the same
12     question that you've been asking for 30 minutes.
13        Q     I haven't asked you a date yet.  I
14     want --
15        A     Yeah, but you know, this is like, no
16     offense, lawyer trickery right now.  I'm sorry,
17     but I'll sit -- like what you just did was the
18     exact reason why this is -- really, come on.
19        Q     I just want to --
20        A     Cut to the chase.  You asked me if
21     they are in default.  I said no.
22        Q     Right.  What I want to understand is
23     your declaration claims that it had been cured.
24     What I want to understand --
25        A     No, what I said is -- okay, let's be
```

Page 215

1    clear -- I never believed them to be in default.
2    But if for some crazy reason somebody thinks
3    they were in default, by simple fact of us
4    actually executing an additional amendment and
5    giving them additional capital means in my mind
6    that it's satisfied.  That's what I say there.
7    There is a date right there in the declaration.
8         Q    Right.  So you're not pointing to any
9    cure that may have occurred between May 31st and
10   May 15th; right?
11        A    I'm -- what I'm saying again is I do
12   not believe there was a default, so, therefore,
13   there was not a cure.  But if for some crazy
14   reason somebody thinks there was a default, in
15   my mind there never was.  And the simple fact
16   that we executed this and gave them additional
17   capital, you know, to me it's satisfied.
18        Q    You understand that any default would
19   need to be cured to Fortress's reasonable
20   satisfaction.  That's the terms of the
21   agreement; right?
22        A    I believe that's what it says.
23             MR. FOSTER:  All right.  Doug, I've
24        been very patient, haven't said anything
25        else.  At this point I'm going to put the

Page 216

1           hammer down.  I'm going to point out to the

2           witness the judge has already ruled in the

3           '358 case, the '360 case exactly as this

4           witness has testified.

5                   MR. WINNARD:  I'm exploring the

6           veracity of the declaration to make sure I

7           understand what the witness means by "cured"

8           because we think that that's actually a

9           material dispute that's part of the

10          discovery and the dispute as to what

11          standing was at that time these actions were

12          filed.

13                  I understand your position, but we're

14          entitled to discovery on this.

15     BY MR. WINNARD:

16          Q     I'm not trying to talk in circles.

17     Let me make sure I understand what you're

18     saying.

19                  It's your testimony there was never an

20     event of default; right?

21          A     Correct.

22          Q     And that's true for all periods of

23     time from December 2014 until Uniloc 2017

24     acquired assets in, I think, May 2018?

25          A     That has been my belief.

Page 217

1      Q    Given that it's your belief that there

2    was no event of default, it is your

3    understanding that Uniloc didn't take any

4    specific action to cure any event of default at

5    any time; right?

6              MR. FOSTER:  Objection.

7              THE WITNESS:  We would have to put

8         them in default.  They would have had to

9         realize or believe they were in default to

10         take action.

11              Now, we did things and we amended the

12         strategy and had discussions about that and

13         so forth, you know.  So there's things

14         around that, but we never did it

15         specifically because there was an event of

16         default or to cure an event of default.

17    BY MR. WINNARD:

18      Q    So I understand, the execution of the

19    third amendment in May 2017, is it your view

20    that that amendment itself was a cure or is it

21    evidence that at some point leading up to that

22    amendment, there would have been a cure?

23      A    The way I -- what I'm saying is I

24    never would have done that if these guys were in

25    default.  So, therefore, I guess I would say

Page 222

1      Q     Okay.  We have two numbers here saying

2      that Uniloc's value in patents currently exceeds

3      30 million and Fortress expected that value to

4      add an additional 60 million with the loan of

5      10 million in May of 2017; right?

6      A     That's what it says.

7      Q     So with the extension of financing in

8      May 2017, Fortress was looking at having about

9      $26 million invested in Uniloc for what it

10     considered over $90 million in evaluation;

11     right?

12     A     That's what it sounds like this is

13     stating.

14     Q     Do you have any reason to disagree

15     with those valuations?

16     A     No, I just wasn't involved in the

17     valuation, so I hesitate to opine on this.  But

18     that's what this says.

19     Q     So if it were an event of default

20     after May 2017, Fortress would be able to take

21     possession of collateral that it had valued at

22     at least 30 million, if not up to 90 million;

23     right?

24              MR. FOSTER:  Objection --

25              THE WITNESS:  Again, the same answer I

                                        Page 223

1        gave about ten minutes ago.  If there was an

2        event of default, I believe we would be able

3        to exercise our rights as defined in the

4        document.

5   BY MR. WINNARD:

6        Q    Right.  I just want to be specific to

7   Uniloc.  The valuation at the time that Fortress

8   lent additional money in May 2017 was over

9   $90 million; is that right?

10            MR. FOSTER:  Objection.

11            THE WITNESS:  At the time of this

12        amendment, what was -- you're saying the

13        value we estimated or somebody put a value

14        on this of $90 million, which was

15        $30 million from the beginning and an

16        additional 60 million if we acquired those

17        patents.  Is that what you're saying?

18   BY MR. WINNARD:

19        Q    That's right.

20        A    That's what it looks like.

21        Q    So even if we look at the -- strike

22   that.  Withdrawn.

23            If Fortress lent Uniloc another

24   $10 million, it would still have a valuation

25   exceeding 30 million even if Uniloc did not

Page 224

1    purchase the patents that Fortress expected;
2    right?
3              MR. FOSTER:  Objection.
4              THE WITNESS:  So if they didn't buy
5         any more patents, we estimated the value
6         remaining to be $30 million.
7    BY MR. WINNARD:
8         Q    And that value exceeding $30 million
9    was still larger than the total amount of money
10   that Fortress had lent to Uniloc across all
11   three levels; right?
12        A    I -- we're relying on the 26 and there
13   was 30, and I don't -- again, I'm not trying to
14   be smart, but I forgot what we got paid back,
15   but it seems like it would be larger than what
16   we lent them, correct.
17        Q    So assuming there had been an event of
18   default after May 2017, Fortress would have had
19   the right to take possession of collateral that
20   it valued as greater than all of the sums that
21   it had lent to Uniloc; right?
22             MR. FOSTER:  Objection.
23             THE WITNESS:  So in the hypothetical
24        situation where there was a default, we
25        would be able to exercise our rights.  And

Page 225

1        if, in fact, in the documents it says we can

2        take possession of the collateral, then what

3        you said would be correct.

4   BY MR. WINNARD:

5        Q    And in giving Uniloc that additional

6    $10 million, did Fortress place any restrictions

7    on what Uniloc could use those funds for?

8        A    Again, I think we went through this

9    early on in the beginning and I said I don't

10   recall.

11       Q    If we can turn to Exhibit 7.

12       A    Let me refresh.

13            (Exhibit 7 was marked.)

14            THE WITNESS:  Got it.

15   BY MR. WINNARD:

16       Q    You recognize Exhibit 7 as a

17   supplemental declaration of James Palmer; right?

18       A    Yes.

19       Q    You understood you were making the

20   statements in this declaration under penalty of

21   perjury?

22       A    Yes.

23       Q    Did you write this declaration?

24       A    Yes.

25       Q    Did anyone help you write it?

Page 226

1        A       Probably reviewed it internally.  But
2    for the most part, I wrote it.
3        Q       Can you think of anyone who you may
4    have asked to help you write it?
5        A       I don't recall off the top of my head.
6        Q       Did you speak with anyone in preparing
7    your declaration?
8        A       I don't remember.
9        Q       Did you rely on any documents in
10   making the statements in this declaration?
11       A       I don't think so.
12       Q       If you can go to Paragraph 2 of your
13   declaration and start with the second
14   paragraph -- or second sentence.
15       A       I'm sorry, the second paragraph?
16       Q       Second paragraph, second sentence.  I
17   can read it when you're ready.
18       A       Second paragraph, second sentence, I
19   stated there that if -- is that the one, that
20   second sentence you --
21       Q       Can you go ahead and read that since
22   you found it?
23       A       "I stated there that if, contrary to
24   Fortress's view, an event of default had
25   occurred, Uniloc had cured that" --

Page 227

1           REPORTER:  Excuse me.

2           THE WITNESS:  -- "ostensible event of

3       default to Fortress's satisfaction."

4           REPORTER:  Excuse me.  Can you read

5       that again?

6           THE WITNESS:  "I stated there that if,

7       contrary to Fortress's view, an event of

8       default had occurred, Uniloc had cured that

9       ostensible event of default."

10   BY MR. WINNARD:

11       Q    And your statement here is describing

12   the statement you made in the prior declaration

13   that was marked as Exhibit 6; right?

14       A    Correct.

15       Q    And your statement in this declaration

16   is describing that statement as an "if"

17   statement; right?

18       A    I'm not sure I understand.  I stated

19   that if -- I think I stated here what I said to

20   you while we were going through that, that,

21   again, I didn't believe that we were in event of

22   default, but if for some reason somebody defined

23   it as -- I -- in no way did I feel they were and

24   it was satisfied.

25       Q    Right.  I just want to make sure that

1      A      I believe that statement to be
2    correct.
3      Q      And is your testimony about any
4    potential event of default on June 30th, 2017
5    the same as your testimony about any potential
6    event of default on March 31, 2017?
7      A      Again, please ask that again.
8      Q      I don't want to get in trouble for
9    asking it for the 12th time.
10     A      Again, it is the end of the day.  I'm
11   not trying to be difficult.  I'm trying to make
12   sure I hear the question, that's all.
13     Q      Just to shortcut it, your testimony
14   today is that there was no event of default
15   based on a revenue shortfall on March 31st,
16   2017; right?
17     A      Yes.
18     Q      Is your testimony also that there was
19   no event of default based on any revenue
20   shortfall that may have occurred on June 30th,
21   2017?
22     A      Yes.
23     Q      What actions occurred after June 30th,
24   2017 would you point to as evidence of any
25   potential cure of that --

Page 231

1           A      I don't have anything off the top of
2      my head at this point to point to.
3           Q      Just to draw a distinction --
4           A      Other than, you know, I don't believe
5      we ever said, hey, you're in default.  We never
6      considered them to be in default.
7           Q      And because you never considered
8      Uniloc to be in default based on revenue
9      generated as of June 30th, 2017, Uniloc never
10     took any specific actions to cure any issues of
11     default after that date; right?
12               MR. FOSTER:  Objection.
13               THE WITNESS:  So again, I think this
14          is getting back to the question now for the
15          13th time.  Again, I'll state it.
16               I never believed them to be in -- I
17          never considered them to be in event of
18          default.  Uniloc never considered themselves
19          in event of default, so I don't think they
20          would have taken a specific action to cure a
21          default that they did not believe they were
22          in.
23     BY MR. WINNARD:
24          Q      I want to make sure that's also the
25     case for the June 30th, 2017 revenue shortfall.

```
1     Is that your testimony?
2          A     I'll put it even further.  At no time
3     from beginning to whenever did we ever consider
4     that this company was in default from a loan
5     perspective or with a loan outstanding.
6          Q     And when you talk about a company
7     being in default, are you talking about any
8     conditions other than what is stated in the
9     revenue sharing agreement?
10         A     When I -- when I'm talking about
11    Uniloc not being in default talking about any
12    other conditions, I'm talking about at no time
13    did we believe that they were in default while
14    we had a loan outstanding.
15         Q     I just want to ask whether when we
16    talk about default or events of default, is
17    there a difference in your mind between those
18    two terms?
19         A     Default is a default.
20         Q     Is it the same as an event of default?
21         A     You know, again, I'm not a lawyer and
22    I can't -- to me I'm not trying to be cute or
23    anything, but, I mean, I never considered this
24    company to be in default.
25         Q     I'm not asking that.  In your
```

Page 233

1    declaration you used the terms both "default"

2    and "event of default."  And I just wanted

3    clarification.

4              Do you have a distinction in your mind

5    between those two terms?

6         A    In my mind for a company to be in

7    default, we would have to put them in default.

8         Q    Was your understanding based on any

9    terms in the revenue sharing agreement?

10        A    It was based on my 20 plus years of

11   experience.

12        Q    You were aware that Uniloc acquired

13   patents from Hewlett-Packard; right?

14        A    I believe they did acquire some

15   patents from Hewlett-Packard.

16        Q    Prior to the acquisition of those

17   patents, did Uniloc provide any information to

18   Fortress about those patents?

19        A    I don't recall.

20        Q    Uniloc 2017 acquired Uniloc

21   Luxembourg's patent portfolio; right?

22        A    I believe that's correct.

23        Q    Did Uniloc 2017 perform any valuations

24   of the patents that it acquired from Uniloc

25   Luxembourg?

1      A     I don't recall off the top of my head.

2      Q     Who would be the best person to ask at

3  Fortress?

4      A     To be honest, I don't know.

5      Q     You're aware that Uniloc acquired a

6  portfolio of patents that were originally

7  assigned to Philips?

8      A     Who owned those?  Who were they

9  acquired from?

10     Q     It would have been from Pendragon, I

11  believe.

12     A     I believe they did acquire some assets

13  from Pendragon.

14     Q     Did Uniloc provide any information to

15  Fortress about the patents that it intended to

16  acquire from Pendragon?

17     A     I don't recall.

18           MR. WINNARD:  It's now 4:00.  I have

19     questions regarding agreements involving

20     Uniloc 2017 and CF Uniloc, but I'm not going

21     to be getting to those today.

22           VIDEOGRAPHER:  This concludes today's

23     testimony given by James Palmer.  The total

24     number of media used was one and will be

25     retained by Veritext.  The total

1          on-the-record time of questioning is

2          four hours and 48 minutes.

3                    We are off the record at 3:59 p.m.

4                    (Discussion off the record.)

5                    MR. WINNARD:  I just want to make

6          clear that we're keeping this deposition

7          open and that we ask that it be treated as

8          such, that the deposition is not concluded

9          of Mr. Palmer and that there not be any

10         discussions with Mr. Palmer regarding the

11         scope of this deposition or his testimony

12         and we will resume at a time that counsel

13         can agree to or the court will resolve.

14                   MR. FOSTER:  I completely disagree for

15         the reasons I stated 45 minutes ago.

16                   (The Confidential portion of the

17         deposition of JAMES PALMER was concluded.)

18

19                   (Proceedings concluded at 4:02 p.m.)

20

21

22

23

24

25

Page 236

```
1           I, LYNNE M. LEDANOIS, a Certified

2     Shorthand Reporter of the State of

3     California, do hereby certify:

4           That the foregoing proceedings were

5     taken before me at the time and place herein set

6     forth; that a record of the proceedings was made

7     by me using machine shorthand which was

8     thereafter transcribed under my direction; that

9     the foregoing transcript is a true record of the

10    testimony given.

11          Further, that if the foregoing

12    pertains to the original transcript of a

13    deposition in a Federal Case, before completion

14    of the proceedings, review of the transcript [ ]

15    was [X] was not requested.

16          I further certify I am neither

17    financially interested in the action nor a

18    relative or employee of any attorney or party

19    to this action.

20          IN WITNESS WHEREOF, I have this date

21    subso

22    Dated: _____

23

24             _____

              LYNNE MARIE LEDANOIS

25             CSR No. 6811
```